# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re China North East Petroleum Holdings Limited Securities Litigation** | No. 10-CV-04577 (MGC) (THK)<br>ECF Case<br><br><u>CLASS ACTION</u> |
| **THIS DOCUMENT RELATES TO:**<br><br>**All Actions** | |

## JOINT SUPPLEMENTAL MEMORANDUM OF DEFENDANTS
## <u>REGARDING LACK OF ECONOMIC LOSS</u>

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION.................................................................................................................1

II. ACTICON COULD HAVE SOLD ITS NEP SHARES *AT A PROFIT* ON MANY
    DAYS AFTER THE CORRECTIVE DISCLOSURE.............................................................2

    1.  Acticon's Wholly Inadequate Allegations of Economic Loss and Loss Causation.......... 2

    2.  Stock Price and Trading History of Lead Plaintiff Acticon..................................... 3

III. THE FAILURE OF A PLAINTIFF IN A SECURITIES FRAUD ACTION TO
     EXPLOIT OPPORTUNITIES TO AVOID ECONOMIC LOSS AND MITIGATE
     DAMAGES IS FATAL TO SATISFYING THE REQUIREMENTS OF
     ECONOMIC LOSS AND LOSS CAUSATION ....................................................................6

IV. THE UNDISPUTED FACTS SHOW THAT LEAD PLAINTIFF ACTICON DID
    NOT SUFFER ECONOMIC LOSS AND CANNOT SHOW LOSS CAUSATION
    AS A MATTER OF LAW ....................................................................................................11

V.  THE EARLIER PROFFERED LEAD PLAINTIFF CANDIDATES SIMILARLY
    SUFFERED NO ECONOMIC LOSS AND THUS AMENDMENT TO ALLOW
    ANY TO REPLACE ACTICON WOULD BE FUTILE.......................................................15

VI. CONCLUSION ...................................................................................................................18

# TABLE OF AUTHORITIES

**Page**

## Cases

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988)................................................................10

*Clark v. John Lamula Investors, Inc.*, 583 F.2d 594 (2d Cir. 1978)................................9

*Competitive Ass'n, Inc. v. International Health Services*, (1974-1975 Binder) CCH Fed.
    Sec. Law Rep. P94,966 (S.D.N.Y. 1975) ................................................................9

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005)...................................3, 6, 7, 10, 11

*Esplin v. Hirschi,* 402 F.2d 94 (10th Cir. 1968), *cert. denied*, 394 U.S. 928 (1969)......................9

*Foster v. Financial Technology, Inc.,* 517 F.2d 1068 (9th Cir. 1975)............................9

*Fox v. Glickman Corp.,* 253 F. Supp. 1005 (S.D.N.Y. 1975)..........................................9

*Harris v. American Investment Co.*, 523 F.2d 220 (8th Cir. 1975), *cert. denied*, 423 U.S.
    1054 (1976)..............................................................................................................9

*In re Acterna Corp. Secs. Litig.*, 378 F. Supp. 2d 561 (D. Md. 2005)..........................18

*In re Estee Lauder Cos. Secs. Litig.*, No. 06 Civ. 2505 (LAK), 2007 WL 1522620
    (S.D.N.Y. May 21, 2007)........................................................................................7, 8

*In re Merrill Lynch & Co. Research Reports Secs. Litig.*, Nos. 02 MDL 1484, 02 CIV
    9690 (JFK), 2008 WL 2324111 (S.D.N.Y. June 4, 2008) .....................................18

*Leslie Alexander v. Thomas Mellon Evans, et al.*, 88 Civ. 5309 (MJL), 1993 U.S. Dist.
    LEXIS 14560; CCH Fed. Sec. L. Rep. P97,795 (S.D.N.Y. October 15, 1993)..................10, 14

*Malin v. XL Capital Ltd.*, No. 3:03 CV 2001 PCD, 2005 WL 2146089
    (D. Conn. Sept. 1, 2005) .......................................................................................7, 8

*Marbury Management, Inc. v. Kohn,* 470 F. Supp. 509 (S.D.N.Y. April 25, 1979), *aff'd in
    pertinent part*, 629 F.2d 705 (2d Cir.), *cert. denied*, 449 U.S. 1101 (1980).........................9, 10

*Morgan, Olmstead, Kennedy & Gardner, Inc. v. Schipa*, 585 F. Supp. 245 (S.D.N.Y.
    1984) ......................................................................................................................10

*Ross v. Walton*, 668 F. Supp. 2d 32 (D.D.C. 2009) ..............................................7, 8, 9

**Statutes**

15 U.S.C. § 78u-4(b)(4) ................................................................................................ 6

**Treatises**

Restatement (Second) Torts ................................................................................... 10, 11

**Reports**

H.R. Conf. Rep. No. 104-369 ................................................................................. 10

## I.      INTRODUCTION

Defendants China North East Petroleum Holdings Limited ("NEP" or the "Company"), Wang Hung Jun, Guizhi Ju and Zhang Yang; Defendant Ralph E. Davis Associates, Inc. ("Davis"); and Defendant Robert C. Bruce (collectively "Defendants"), submit this joint supplemental memorandum, following the May 12, 2011 hearing on pending motions to dismiss the Consolidated Amended Complaint (the "Complaint"), to address what the Court identified as "a very important question [of] loss causation." *See* Transcript of May 12, 2011 Hearing ("Tr.") Second Supplemental Declaration of Michael J. Coffino ("Coffino 2d Supp. Decl."), Exh. 33 at 11.[1]  As we show, the answer to this question disposes of this action.

In framing its request for supplemental briefing, the Court observed that this case was "peculiar" and "unusual" because it involved the "not common" situation where the share price of a company did not decline and remain down after corrective disclosure.  Tr. at 11-12.  On the contrary, here, the share price either rose or rebounded after a brief decline after the relevant corrective disclosures.  *Id*. at 8.  Moreover, there were—as the Court observed at the hearing— abundant opportunities after corrective disclosures for lead plaintiff Acticon AG ("Acticon") to liquidate its NEP position for a profit because of upward movements in share price.  Tr. at 8.

The Court also noted that the Complaint fails to allege that Acticon sold shares at a loss. Tr. at 8-9.  While the Court noted that an actual sale may not be required, because the post-disclosure share price rose above Acticon's cost, the Court asked the parties whether and to what extent Acticon must come forward with something else to show it would have lost money:

---

[1] References to "Exh. ___" are to exhibits appended to the Declaration of Michael J. Coffino in Support of the Motion of China North East Petroleum Holding Limited to Dismiss the Amended Complaint, dated April 20, 2011.  References to "Coffino 2d Supp. Decl., Exh. __" are to exhibits to the Second Supplemental Declaration of Michael J. Coffino in Support of the Joint Supplemental Memorandum of Defendants Regarding Lack of Economic Loss of Lead Plaintiff Acticon AG, dated June 8, 2011.

> We need something that can show that if he had sold he would have lost money. It has to be some evidence that it would have resulted in a loss and this is a peculiar case. I don't get many cases like this where the price didn't go all the way down. It went down a little and up a little and down a little and up a little.

Tr. at 10-11; *see also id.* at 8-9 ("It passed up many opportunities … to make money on its shares.").

Thus, the Court posed the following question:

> Even if Acticon had many opportunities to sell without loss throughout the class period and chose not to do it, is that an actionable claim?

Tr. at 3.

The answer is "no." This is because Acticon passed on numerous opportunities to sell its holdings for a profit after actual notice to the market that prior financial filings were no longer reliable. In consequence, the Complaint fails to allege two elements of a securities violation: economic loss and loss causation. Further, as we show, amendment would be futile, and, thus, this action should be dismissed with prejudice.[2]

## II.    ACTICON COULD HAVE SOLD ITS NEP SHARES *AT A PROFIT* ON MANY DAYS AFTER THE CORRECTIVE DISCLOSURE

### 1.    Acticon's Wholly Inadequate Allegations of Economic Loss and Loss Causation

Here is what Acticon alleges:

---

[2] Defendants have advanced several other, independent grounds to dismiss this action. Specifically, they demonstrated that in response to the three purported corrective disclosures, NEP's share price (1) *rose*, (2) declined only *negligibly*, and (3) declined temporarily but promptly *rebounded*, which means the purported class cannot, as a matter of law, show loss causation. Similarly, Defendants showed that dismissal is warranted because Plaintiff has failed to allege *scienter* with requisite particularity. Indeed, the Complaint contains no allegations from which scienter can be minimally inferred even in isolation, much less cogently in comparison with other more compelling inferences. Further, Defendant Davis showed that the Complaint fails to state a claim and/or satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA because the claims against Davis, at most a "secondary actor," (1) were based upon forward-looking statements the law deems not actionable under the "bespeaks-caution" doctrine; (2) were based upon demonstrably misquoted or misinterpreted public filing statements; and (3) asserted a claim for relief for aiding and abetting and conspiracy that applicable law does not recognize.

> Lead Plaintiff Acticon Ag, as set forth in its previously filed certification, purchased China North securities during the Class Period on the AMEX and was damaged when the disclosures of the Company's accounting improprieties caused the price of China North's shares to decline.

Complaint (Dkt. 39) ¶ 20; *see also id.* ¶¶ 133 (alleging that as a result of alleged concealment, "Plaintiff and the other members of the Class purchased China North common stock at artificially inflated prices and relied upon the price of the common stock, and the integrity of the market, and were damaged thereby."); 139 (alleged conduct caused "Plaintiff and other members of the Class to purchase China North common stock at artificially inflated prices.").

These conclusory and generalized allegations that an investor was "damaged" because of purported price inflation or post-disclosure share decline (which is not true in this case) are precisely the type of allegations the Supreme Court has found inadequate to provide requisite notice of economic loss or its causal connection with an alleged misrepresentation. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). That Acticon has not pled more is not surprising, for Acticon did not actually suffer *any* loss, as the facts the Complaint omit conclusively show.

### 2.    Stock Price and Trading History of Lead Plaintiff Acticon

Acticon first purchased shares of NEP on January 20, 2010, acquiring 5,000 shares at $9.45 and on January 26, 2010, acquiring 2,500 shares at $8.35. The weighted average price per share for this initial position was $9.08.[3]  2d Supp., Exh. 34 at 1 (Acticon chart); Coffino 2d Supp. Decl., Exh. 35 at 1 (Acticon Cert).[4]

---

[3] By the second purchase date, Acticon had $68,125 invested in its NEP position, calculated as [(5,000 x $9.45) + (2,500 x $8.35)]. The weighted average price of $9.08 is calculated as $68,125 ÷ 7,500 shares.

An investor's "position" in a security is measured in both dollars and shares. The total amount (in dollars) invested into a position/share divided by the number of shares is the investor's weighted average cost per share. The weighted average cost per share of a position tells the investor how the *entire* position

On February 23, 2010, the stock price for NEP closed at $9.37.[5]  After close of the market, the Company disclosed that, as a result of preparing responses to an SEC comment letter, certain of its prior financial filings should not be relied upon because of non-cash errors regarding the accounting for certain warrants attached to debt financings in 2008 and 2009.  NEP also disclosed an error regarding certain prior "ceiling test" impairment calculations and related depreciation, depletion and amortization for its oil and gas properties.  Exh. 3; Complaint ¶¶ 5, 86.  The Company also disclosed that because the accounting errors were all "non-cash charges," it would <u>not</u> report any change to its previously disclosed *revenues, cash balances or liquidity* and *capital resources* disclosures.  Exh. 3.

The next day, NEP stock closed at $8.68, or $0.69 lower, the same price change NEP experienced exactly one month earlier on January 22, 2010 as a result of normal daily trading.  Exh. 6.  After the next two trading days, however, the stock price rebounded to $9.23 and thus recaptured all but fourteen cents of the initial drop (and higher than Acticon's average price in the position).  Coffino 2d Supp. Decl., Exh. 34 at 1 & Exh. 35 at 1.  The NEP share price

---

is doing compared to a current market price for that security.

[4] The share purchase and sale data is derived from what Acticon and the other potential lead plaintiffs submitted in support of their respective applications to be appointed lead plaintiff and is compiled as a single exhibit for convenience.  *See* Coffino 2d Supp. Decl., Exh. 35.  Furthermore, we provide a series of charts as Exh. 34 that show the stock positions of Acticon and the other proposed plaintiffs compared with the NEP share closing prices.

[5] Both commercial and individual investors rely on the closing price of a security as a given day's "price" for the security.  While some shares have high volatility during a trading day ("intraday" price changes), the share prices of many larger companies typically change little intraday.  Regulatory, taxing, and other entities accept a closing day share price as "final" or indicative of that day's price.  Attempting to "cherry pick" prices using intraday quotes can be self serving and misleading as a given intraday price may only be available during a short window and for only a limited number of shares.  Closing prices thus provide a consistent measure for investors to evaluate changes in stock prices over time, and, therefore, the NEP market prices used are final, closing prices.

remained above Acticon's $9.08 average share price for two additional days.  Coffino 2d Supp. Decl., Exh. 34 at 1.  Acticon did not sell and realize gains in response to the price rebound.

A short time later, on March 8, 2010, the Company disclosed the *quantitative* impact of the accounting errors by quarter.  In addition, the Company identified errors in calculating the carrying value of its oil and gas properties.  The Company also announced that, with the forthcoming amendments to financial statements, it would disclose a material weakness in its internal controls over financial reporting.  Exh. 7.  The first trading day after this first quantitative announcement of the anticipated impact on prior reported financial results, NEP stock price increased by $0.14 per share, to close at $8.75 a share.  Exh. 6.

Between March 9 and April 19, the stock traded above $9.37 seven times, above $9.08 ten times, and as high as $9.85 (on April 14).  Exh. 6.  Acticon again chose not sell and realize gains during this period.  *See* Coffino 2d Supp. Decl., Exh. 34 at 1 & Exh. 35 at 1.

On April 19, and thus *after* the first and second disclosures, Acticon purchased 10,000 additional shares of NEP stock at $8.34 a share, more than doubling its position.  This brought its holdings to 17,500 shares with a weighted average price per share of $8.66 a share.  *Id.*[6]

On April 20, 2010, the Company revised the quantitative impact information disclosed on March 8.  Exh. 11.  The first trading day after this announcement, NEP stock price fell a negligible $0.09 (1.0%).  Exh. 6.  This change is actually one of the smallest day-to-day price changes since NEP went public and only one-fourth of the average daily price change, meaning it is well within NEP's normal daily price fluctuation.  Exh. 6.

---

[6] These post-disclosure purchases contradict the representation of counsel for plaintiff at the hearing on May 12.  At the time, the Court sought to confirm that Acticon, despite the corrective disclosures, "kept buying."  In response, counsel represented: "Acticon did not continue to buy."  Tr. at 7.

After April 20, the price of NEP stock rose above $8.66 on five separate days.  Exh. 6;

Coffino 2d Supp. Decl., Exh. 35 at 1.  Again Acticon did not sell and take gains.

On the contrary, rather than sell, consistent with its *modus operandi*, after the third

disclosure Acticon continued to increase its holdings, apparently viewing price declines as

buying opportunities.  It purchased 2,500 shares on May 6 (at $6.99 a share), 31,000 shares on

May 14 (at $6.71 a share) and 9,000 shares on May 17 (at $6.45 a share).[7]  Coffino 2d Supp.

Decl., Exh. 34 at 1 & Exh. 35 at 1.  The alleged class period ended on May 26, 2010.

At no time since its initial purchases in January 2010 through the close of the purported

class period did Acticon sell a single share.  *Id*.

## III.    THE FAILURE OF A PLAINTIFF IN A SECURITIES FRAUD ACTION TO EXPLOIT OPPORTUNTIES TO AVOID ECONOMIC LOSS AND MITIGATE DAMAGES IS FATAL TO SATISFYING THE REQUIREMENTS OF ECONOMIC LOSS AND LOSS CAUSATION

"A private plaintiff who claims securities fraud must prove that the defendant's fraud

caused an economic loss."  *Dura*, 544 U.S. at 338, 342, citing 15 U.S.C. § 78u-4(b)(4).  Thus,

plaintiff must show a causal connection between the material misrepresentation and the loss, also

known as "loss causation."  *Id*.  As the Supreme Court in *Dura* recognized—in finding a

---

[7]

**Acticon's Ongoing Investment in NEP**

| Purchase Date | No. of Shares | Price per Share | Total Shares Held | Purchase Price | Total Investment | Weighted Avg. Price |
|---|---|---|---|---|---|---|
| 1/20/10 | 5,000 | $9.45 | 5,000 | $ 47,250 | $ 47,250 | $ 9.45 |
| 1/26/10 | 2,500 | $8.35 | 7,500 | $ 20,875 | $ 68,125 | $ 9.08 |
| 4/19/10 | 10,000 | $8.34 | 17,500 | $ 83,400 | $ 151,525 | $ 8.66 |
| 5/6/10 | 2,500 | $6.99 | 20,000 | $ 17,475 | $ 169,000 | $ 8.45 |
| 5/14/10 | 31,000 | $6.71 | 51,000 | $ 208,010 | $ 377,010 | $ 7.39 |
| 5/17/10 | 9,000 | $6.45 | 60,000 | $ 58,050 | $ 435,060 | $ 7.25 |

securities complaint had failed to adequately *allege* loss causation—"it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."  *Id.* at 347. Unless the complaint provides such notice, it must be dismissed.

In the post-*Dura* world, courts have held consistently that a plaintiff who holds a stock after the stock price returns to or exceeds its cost has not, as a matter of law, suffered economic loss, even where the stock price falls on a "curative" or "corrective" disclosure before returning to or exceeding the initial purchase price level.  *See In re Estee Lauder Cos. Secs. Litig.*, No. 06 Civ. 2505 (LAK), 2007 WL 1522620 (S.D.N.Y. May 21, 2007) (dismissing complaint); *Malin v. XL Capital Ltd.*, No. 3:03 CV 2001 PCD, 2005 WL 2146089 (D. Conn. Sept. 1, 2005) (same); *Ross v. Walton*, 668 F. Supp. 2d 32 (D.D.C. 2009) (same).  *Estee Lauder*, *Malin*, and *Ross* are each squarely on point.

In *Estee Lauder*, Judge Kaplan granted a Rule 12(b)(6) motion to dismiss a securities fraud action in which, like here, the post-corrective disclosure share price rose above the pre-disclosure price.  *Estee Lauder*, 2007 WL 1522620, at *2.  Estee Lauder shares closed at $37.76 on the first day of the class period, April 28, 2005.  *Id.* at *1.  Thereafter, the stock traded in the $38 to $40 range for several months before dropping sharply towards the end of the class period. *Id*.  The share price, however, recovered to the $38 level, traded above and below $38 for some time, reached $38 to stay and closed thereafter at $47.  *Id.*  Plaintiff acquired his shares during the class period at an undisclosed price, and there was no allegation he sold any shares or suffered any actual loss.  *Id.*  Judge Kaplan rejected the argument that economic loss was established simply by showing the price of the security on the date of the purchase was inflated because of the misrepresentation, *id.* , or that an economic loss is sustained simply because the

price of a stock drops after disclosure.  *Id.* at 1 n.5.  Rather, citing *Dura*, Judge Kaplan found that

the "complaint patently fail[ed] to plead loss causation," "[a]s it is perfectly plain that plaintiff

would have profited if he sold after September 2006, and may well profit in the future if he as

not yet sold."  *Id.* at 1.

   In *Malin*, the court rejected a claim similar to what Acticon advances, that the complaint

demonstrated requisite loss and causal connection by alleging only an inflated price and a price

drop causally connected to the truth reaching the market.  2005 WL 2146089 at **3, 4.  The

court found those allegations wanting in light of (1) evidence defendants presented that prices

*returned* to the pre-disclosure trading price; and (2) plaintiff's failure to allege a sale during the

class period that realized economic loss.  *Id.* at *4.  Both factors are, of course, also present in

this case.  The *Malin* Court found that a price fluctuation without any realization of an economic

loss is functionally equivalent to the Supreme Court's rejection of an artificially inflated

purchase price alone as economic loss: "if the current value is commensurate to the purchase

prices, there is no loss, regardless of whether the purchase price was artificially inflated."  *Id*.

Thus, the *Malin* Court found Plaintiffs' allegations of an economic loss insufficient in light of

evidence of price recovery and dismissed the action.  *Id.*

   *Ross* involved a securities class action based on an allegedly fraudulent disclosure that

plaintiffs contended caused a roughly $2 fall in stock price.  668 F. Supp. 2d at 36.  Thereafter,

the stock price rose higher than the plaintiffs' purchase price at least three times after disclosure.

*Id.* at 43.  Because the post-disclosure value had been commensurate with (and, indeed higher

than) the plaintiffs' purchase price, the court held that there could be no loss.  *Id.* at 42.

Ultimately, the court held that "[l]ogically, a plaintiff can not demonstrate the amount the

purchaser overpaid if the stock value rose greater than the purchase price on multiple occasions." *Id.* at 43. That same logic (and law) applies here.

In support of its conclusion, the *Ross* Court noted that it was "unaware of any authority in which actual economic loss was found when the stock value returned to pre-disclosure prices and could have been sold at a profit just after the class period." *Id.* at 43.

What is more, this post-*Dura* case law is deeply rooted in prior decisional law. The Second Circuit has long viewed the failure to mitigate damages in securities cases as a ground to reduce or eliminate damages. *E.g.*, *Clark v. John Lamula Investors, Inc.*, 583 F.2d 594, 605 (2d Cir. 1978). Other Courts of Appeal are in accord. *E.g., Harris v. American Investment Co.*, 523 F.2d 220 (8th Cir. 1975), *cert. denied*, 423 U.S. 1054 (1976); *Foster v. Financial Technology, Inc.,* 517 F.2d 1068 (9th Cir. 1975); *Esplin v. Hirschi,* 402 F.2d 94 (10th Cir. 1968), *cert. denied*, 394 U.S. 928 (1969). *See also Competitive Ass'n, Inc. v. International Health Services*, (1974-1975 Binder) CCH Fed. Sec. Law Rep. P94,966 (S.D.N.Y. 1975); *Fox v. Glickman Corp.,* 253 F. Supp. 1005 (S.D.N.Y. 1975).

Courts sometimes refer to the failure to mitigate in the securities fraud context as making a second investment decision based on the new total mix of information that includes corrective disclosures. These cases also hold that a securities plaintiff may not recover for avoidable losses, especially when the investor holds a position it can liquidate for a profit. For example, in *Marbury Management, Inc. v. Kohn,* 470 F. Supp. 509 (S.D.N.Y. April 25, 1979), *aff'd in pertinent part*, 629 F.2d 705 (2d Cir.), *cert. denied*, 449 U.S. 1101 (1980), the Court held that:

> [I]f the plaintiff continues to hold the stock after the discovery of the fraud, he can be deemed to have made a 'second investment decision' based on the total mix of information now available.

*Id*. at 516, n. 13.  *See also Leslie Alexander v. Thomas Mellon Evans, et al.*, 88 Civ. 5309 (MJL),

1993 U.S. Dist. LEXIS 14560; CCH Fed. Sec. L. Rep. P97,795 (S.D.N.Y. October 15, 1993)

(decision to hold securities after discovery of alleged fraud "constituted a new decision to retain

investment"); *Morgan, Olmstead, Kennedy & Gardner, Inc. v. Schipa*, 585 F. Supp. 245, 249-50

(S.D.N.Y. 1984) (same).  *See also* Restatement (Second) Torts § 549, Comments on Clause

(1)(a).

> As this Court once put it:

>> Such a result obviously comports with the social policies underlying the
>> mitigation of damages rule in that it discourages the needless accumulation of
>> damages that can reasonably be avoided, and it also has the common-sense effect
>> of preventing recovery for 'wounds which in a practical sense are self-inflicted.'
>> (Citation omitted).

*Morgan, Olmstead, Kennedy & Gardner, Inc.*, 585 F. Supp. at 248-49.

While these decisions are grounded in tort common law, they also invoke the policy-

infused principle that "[t]he law does not insure . . . investments against loss."  *Alexander*, 1993

U.S. Dist. LEXIS 14560 at *39.  *See also Dura*, 544 U.S. at 346-48 (citing H.R. Conf. Rep. No.

104-369, at 31, U.S. Code Cong. & Admin. News 1995, pp. 679, 730; *cf. Basic Inc. v. Levinson*,

485 U.S. 224 (1988) (White, J., joined by O'Connor, J., concurring in part and dissenting in part)

("[A]llowing recovery in the face of affirmative evidence of nonreliance would effectively

convert Rule 10b-5 into a scheme of investor's insurance.  There is no support in the Securities

Exchange Act, the Rule, or our cases for such a result" (internal quotation marks and citations

omitted).).[8]

---

[8] This Court referenced "mitigation" at the May 12 Hearing.  (Tr. at 12 ("I don't know what mitigation of
loss means in the securities field, but I would like both sides to address that here.").)  Although the
economic loss requirement addressed in the brief is a form of mitigation, alleging and proving economic
loss and loss causation is a statutory prerequisite to the bringing of a securities action.  As the case law
demonstrates, a plaintiff who has made no below-market sales and could have sold at a profit simply does

As we now show, application of these principles to the market circumstances surrounding the stock portfolio and trading history of lead plaintiff Acticon leads inescapably to the conclusion that Acticon has not suffered economic loss and cannot show loss causation.

## IV.   THE UNDISPUTED FACTS SHOW THAT LEAD PLAINTIFF ACTICON DID NOT SUFFER ECONOMIC LOSS AND CANNOT SHOW LOSS CAUSATION AS A MATTER OF LAW

Whether Acticon experienced economic loss is analyzed by comparing its share purchase price prior to February 23, 2010—the day the Company alerted the market that certain of its prior financial filings could no longer be relied upon—against market prices after that disclosure. On that day in February, the Company specifically notified the market that it needed to file restatements because of "non-cash" errors in the accounting for certain warrants issued in conjunction with financings in 2008 and 2009 and errors in "ceiling test" impairment calculations and related depreciation.  Exh. 3; Complaint ¶¶ 5, 86.

Thus, by February 23, the facts giving rise to the need for restatements of prior financial filings had "become generally known."  *Dura*, 544 U.S. at 344 (citing Restatement (Second) of Torts).  On this news, the price of NEP stock declined 7.4%.  And while the market recaptured this price decline in a couple of days (*see* NEP Opening Brief at 36-38 and NEP Reply Brief at 26-27)—meaning investors suffered no loss from the prior errors—the Company had placed shareholders on notice of a material problem with prior financial statements.

Further, if not February 23, 2010, then the trigger date for the duty to mitigate occurred shortly thereafter.  Less than two weeks after the February 23 disclosure, on March 8, 2010, the Company disclosed the *quantitative* impact of the accounting errors by quarter.  In addition, they further identified errors in calculating carrying value of oil and gas properties.  Thus, not only

---

not meet the statutory prerequisite of economic loss.

were the corrective facts "generally" known as of February 23, but they were "specifically" known as of March 8.  Exh. 7.

In response to the March 8 disclosure, the stock rose $0.14 (or 1.65%).  While this speaks volumes about the lack of <u>any</u> loss causation in this action, the quantification of the anticipated restatements on March 8 acutely alerted investors of the opportunity to mitigate potential loss by selling their positions.[9]

Once alerted, Acticon had numerous opportunities to avoid loss and generate profit from its NEP holdings.  Rather than do so, however, it chose to speculate on even greater gains.  In other words Acticon repeatedly decided not to realize gain and avoid loss.

As noted, Acticon first purchased shares of NEP on January 20, 2010, acquiring 5,000 shares at $9.45 and on January 26, 2010, acquiring 2,500 shares at $8.35.  The weighted average price per share for this initial position was $9.08.  After the first disclosure on February 23, 2010, Acticon could have sold this investment for a profit on **three separate dates** prior to the second disclosure on March 8: February 26 (*$9.23*); March 1 (*$9.17*) and March 3 (*$9.14*).  Coffino 2d Supp. Decl., Exh. 34 at 1 & Exh. 35 at 1.  Acticon did not sell a single share.  *Id*.

More opportunities to achieve gain and avoid loss loomed.  After the second disclosure on March 8, 2010, and prior to the third disclosure on April 20, 2010, Acticon could have sold its investment for a profit on **ten separate dates:** March 17 (*$9.15*), March 23 (*$9.38*), March 24 (*$9.24*), April 7 (*$9.75*), April 8 (*$9.63*), April 9 (*$9.68*), April 12 (*$9.59*), April 13 (*$9.59*),

---

[9] The Company made a third disclosure that arguably was "corrective," but in reality was a refinement of the March 8 disclosure.  On April 20, 2010, the Company revised the quantitative impact information disclosed on March 8.  Exh. 11.  The first trading day after this announcement, NEP stock price fell a legally meaningless $0.09 (1.0%).  Exh. 6.

April 14 (*$9.85*) and April 15 (*$9.10*).  Coffino 2d Supp. Decl., Exh. 34 at 1 & Exh. 35 at 1.  Again, Acticon stood pat.  *Id.*

Indeed, rather than sell, Acticon <u>increased</u> its position in NEP stock.  On April 19, *after* the first <u>and</u> second disclosures, Acticon purchased 10,000 additional shares of NEP stock at $8.34 a share.  This brought its holdings to 17,500 shares with a weighted average price per share of $8.66 a share.  Coffino 2d Supp. Decl., Exh. 34 at 1 & Exh. 35 at 1.

Not surprisingly, Acticon eschewed additional opportunities to realize gain from its NEP stock after the third disclosure.  After April 20, 2010, Acticon could have sold its investment for a profit on **five separate dates** prior to the end of the class period on May 26, 2010: April 23 (*$8.78*), April 26 (*$8.83*), April 29 (*$8.80*), April 30 (*$8.83*) and May 3 (*$8.86*).  Coffino 2d Supp. Decl., Exh. 34 at 1 & 35 at 1.  Acticon did not avail itself of any of these opportunities.  *Id.* On the contrary, consistent with its investment pattern, after the third disclosure, Acticon *continued to increase* its holdings.  It purchased 2,500 shares on May 6 (at $6.99 a share), 31,000 shares on May 14 (at $6.71 a share), and 9,000 shares on May 17 (at $6.45 a share).  *Id.*[10]

For the Court's convenience, the following chart summarizes each of the dates after the February 23, 2010 disclosure that NEP's share price closed above the Acticon's weighted average share price.

---

[10] This increased the Acticon position to 60,000 shares at a weighted average price per share of $7.25.

| Date | Acticon Adjusted Shares Held | Acticon Weighted Average Price per Share | NEP Closing Price per Share |
|---|---|---|---|
| **2/23/2010** | | | |
| 2/26/2010 | 7.500 | 9.083 | 9.23 |
| 3/1/2010 | 7,500 | 9.083 | 9.17 |
| 3/3/2010 | 7,500 | 9.083 | 9.14 |
| **3/8/2010** | | | |
| 3/17/2010 | 7,500 | 9.083 | 9.15 |
| 3/23/2010 | 7,500 | 9.083 | 9.38 |
| 3/24/2010 | 7,500 | 9.083 | 9.24 |
| 4/6/2010 | 7,500 | 9.083 | 9.08 |
| 4/7/2010 | 7,500 | 9.083 | 9.75 |
| 4/8/2010 | 7,500 | 9.083 | 9.63 |
| 4/9/2010 | 7,500 | 9.083 | 9.68 |
| 4/12/2010 | 7,500 | 9.083 | 9.59 |
| 4/13/2010 | 7.500 | 9.083 | 9.59 |
| 4/14/201 | 7.500 | 9.083 | 9.85 |
| 4/15/2010 | 7.500 | 9.083 | 9.10 |
| 4/19/2010 | 17,500 | 8.656 | 8.08 |
| **4/20/2010** | 17,500 | 8.656 | 8.66 |
| 4/23/2010 | 17,500 | 8.656 | 8.78 |
| 4/26/2010 | 17,500 | 8.656 | 8.83 |
| 4/29/2010 | 17,500 | 8.656 | 8.80 |
| 4/30/2010 | 17,500 | 8.656 | 8.83 |
| 5/3/2010 | 17,500 | 8.656 | 8.86 |
| 5/6/2010 | 20,000 | 8.448 | |
| 5/14/2010 | 51,000 | 7.390 | |
| 5/17/2010 | 60,000 | 7.249 | |

In sum, after becoming an NEP shareholder in January 2010, and until the end of the class period, Acticon did not sell any shares despite numerous opportunities to generate profit and thus avoid any loss for its NEP holdings. By holding its position, Acticon "made a fully informed decision to retain [its] investment." *Alexander*, 1993 U.S. Dist. LEXIS 14560 at *39. As a matter of law, Acticon has suffered no loss and cannot, in consequence, function as lead plaintiff (or even a class member) in this action.

14

**V.      THE EARLIER PROFFERED LEAD PLAINTIFF CANDIDATES SIMILARLY SUFFERED NO ECONOMIC LOSS AND THUS AMENDMENT TO ALLOW ANY TO REPLACE ACTICON WOULD BE FUTILE**

The same flaw that disqualifies Acticon as Lead Plaintiff infects each of the earlier lead plaintiff candidates who previously lost out to Acticon for the lead role.  We briefly discuss each.

Darr Barshis.  Mr. Barshis first purchased 1,500 NEP shares in December 2009, which he sold on January 4, 2010 for a profit.  Coffino 2d Supp. Decl., Exh. 34 at 2 & Exh. 35 at 2.  He then purchased 1,000 shares at $9.45 a share on February 17 and 500 shares at $9.32 a share on February 23, which he again sold for a profit on April 7, 2010.  *Id.*  Thus, a month after the second disclosure, he did not have any position in NEP stock.  While he made three more purchases during the period April 8 to April 20, 2010, they occurred <u>after</u> the two material corrective disclosures, which means the purchase prices could not be "inflated" and Barshis could not have suffered a cognizable loss as a matter of law.  His last purchase of 500 shares, on April 23, came after all three disclosures and for the same reason cannot form the basis for a claim in this action.  *Id.*

Craig Moore.  Mr. Moore made two purchases of NEP stock.  The first was 750 shares at $9.00 a share on March 5.  Coffino 2d Supp. Decl., Exh. 34 at 3 & Exh. 35 at 3.  Since this purchase occurred after the first disclosure, Moore could not have purchased at an inflated price either because his purchase came after the facts about the need for restatements had "become generally known" and because the subsequent two disclosures did not cause any cognizable reduction in stock price.  *Supra* at 11-12.  Regardless, he could have sold these shares for a profit multiple times, including on March 17 (*$9.15*), March 23 (*$9.38*), March 24 (*$9.24*), March 26 (*$9.02*), April 6 (*$9.08*), April 7 (*$9.75*), April 8 (*$9.63*), and April 9 (*$9.68*).  *Id.*  Moore made

an additional purchase of 1,100 shares on April 12, 2010 at $9.50 a share. *Id*. This occurred after the first two disclosures and cannot form the basis for a claim as a matter of law.

Mohamed Elkhoga. Mr. Elkhoga purchased his first NEP shares on August 17, 2009 and bought and sold several times after this initial purchase until the first disclosure. As of February 24, 2010, the day after the first disclosure, Elkhoga owned 30,700 shares at a weighted average price per share of $8.40. Coffino 2d Supp. Decl., Exh. 34 at 4-5 & Exh. 35 at 4-5. Between February 24 and the date of the second disclosure on March 8, Elkhoga could have sold his position for a profit on **seven separate dates**: February 25 (*$8.73*), February 26 (*$9.23*), March 1 (*$9.17*), March 2 (*$9.07*), March 3 (*$9.14*), March 4 (*$9.06*) and March 5 (*$8.94*). *Id*.

Elkhoga added 1,600 shares at $8.84 a share to his NEP portfolio on March 18 (Coffino 2d Supp. Decl., Exh. 34 at 4; Exh. 35 at 5), ten days after the second disclosure, which should be excluded because by then the market was on notice of both the need for the restatements and their quantitative impacts. Regardless, after this acquisition, while holding 32,300 shares at a weighted average price per share of $8.43, Elkhoga could have sold for a profit on almost **twenty separate days** during the period March 19 to April 19 at prices that ranged from $8.60 to $9.85. Coffino 2d Supp. Decl., Exh. 34 at 4-5. Elkhoga bought 720 shares at $8.28 on April 19, after the two initial disclosures, bringing his portfolio to 33,020 at a weighted average price per share of $8.43, which he could have sold thereafter at a profit on **nine separate days** during the period April 21, after the third disclosure, until May 4, 2010, at prices ranging from $8.52 to $8.86.[11] *Id*.

---

[11] On May 19, Elkhoga also added 3,270 shares at $5.80 to his NEP position. This last acquisition cannot form the basis for a claim since it occurred after the three disclosures. Further, the price of NEP stock has been above $5.80 more than **fifty** days since Elkhoga made this acquisition, and he thus had significantly more than ample opportunity to realize gain from that purchase as well.

George Strum.  Mr. Strum purchased 15,000 shares of NEP stock on January 7, 2010 for $10.30 a share and 10,000 shares on January 28, 2010 for $7.74 a share.  He made no other purchases.  The weighted average price per share for his 25,000 shares is $9.28.  After the second disclosure date on March 8, 2010, Strum could have sold his investment for a profit on **seven separate dates** prior to the third disclosure:  March 23 (*$9.38*), April 7 (*$9.75*), April 8 (*$9.63*), April 9 (*$9.68*), April 12 ($9.59), April 13 (*$9.59*), and April 14 *($9.85*). He did not sell any shares.  Coffino 2d Supp. Decl., Exh. 34 at 6 & Exh. 35 at 6.

Geoffrey Cleall.  Mr. Cleall purchased and sold 5,000 shares of NEP stock on December 28, 2009, zeroing out his position (and realizing a small profit on the intraday price movement).  He then purchased 20,000 shares in January and sold 17,900 of those shares by February 11, 2010.  Thus, by February 23, the date of the first disclosure, Cleall owned 2,100 shares at a weighted average price per share of $8.95.  Between February 24 and March 8, the date of the second disclosure, Cleall could have sold his investment for a profit on **five separate dates**: February 26 (*$9.23*), March 1 (*$9.17*), March 2 (*$9.07*), March 3 (*$9.14*) and March 4 (*$9.06*).  After the second disclosure date on March 8, 2010, Cleall bought and then sold an additional 10,000 shares, twice.  Since these transactions occurred after the second disclosure, as shown (*supra* at 16), they may not form the basis for any claim.  What is more, both sales generated a profit for Cleall.  Coffino 2d Supp. Decl., Exh. 34 at 7 & Exh. 35 at 7-8.[12]

---

[12]  Two other earlier competing plaintiffs purchased their shares after the third disclosure and thus could not possibly have suffered a loss.  Christine Bauman purchased and sold 10,000 shares before February 23, 2010 and therefore held no position at the time of the first disclosure.  Thereafter, Ms. Bauman purchased 25,000 on May 21, 2010, well after the third disclosure date on April 20, 2010.  Coffino 2d Supp. Decl., Exh. 35 at 9.  Julian Aude purchased all of his 9,000 shares on seven separate occasions— April 30, May 4, May 5, May 6, May 7, May 8, May 24, and May 25—all of which are after the third disclosure date.  Coffino 2d Supp. Decl., Exh. 35 at 10-11.

In sum, the long list of proposed lead plaintiffs does not contain a single plaintiff who suffered economic loss.  Plaintiffs, effectively, have enjoyed at least eight bites at the apple.  Allowing yet another would not only be futile, but also unwarranted.  *See In re Acterna Corp. Secs. Litig.*, 378 F. Supp. 2d 561, 588-89 (D. Md. 2005) (dismissing complaint based on failure to plead loss causation, and denying leave to amend as futile); *In re Merrill Lynch & Co. Research Reports Secs. Litig.*, Nos. 02 MDL 1484, 02 CIV 9690 (JFK), 2008 WL 2324111, at *8 (S.D.N.Y. June 4, 2008) (dismissing complaint on loss causation grounds, and denying proposed amendment or further amendment on futility grounds).  When experienced counsel round up as many as eight proposed lead plaintiffs, whether *en masse* or *seriatim,* and not one can pass threshold muster, liberal amendment policy has overstayed its welcome.  The time has come to say: enough.

## VI.        CONCLUSION

Lead plaintiff Acticon cannot satisfy the statutory requirement under the PSLRA for alleging economic loss and loss causation.  Further, neither can any of the other previous candidates for lead plaintiff.  Thus, affording counsel for plaintiffs another opportunity to unearth a client would be futile.  It would also be wrong.  Counsel for plaintiffs have had more than ample opportunity to identify a suitable plaintiff for this purported class action.  Defendants respectfully request that the Court dismiss the Complaint with prejudice.

Dated: June 8, 2011

Respectfully submitted,

**THE CRONE LAW GROUP**                          **DEBEVOISE & PLIMPTON LLP**[13]

By: /s/ Michael J. Coffino                       By: /s/ Edwin G. Schallert
    Michael J. Coffino (*Pro Hac Vice*)       Edwin G. Schallert
    Jaime J. Santos (JS-3361)                 Jared I. Kagan
101 Montgomery Street, Suite 2650                919 Third Avenue
San Francisco, California 94104                  New York, New York 10022
Telephone: (415) 955-8900                        Telephone:  (212) 909-6000
mcoffino@cronelaw.com                            egschall@debevoise.com
jsantos@cronelaw.com

                                                     *Attorneys for Defendant Robert C. Bruce*

**REAVIS PARENT LEHRER LLP**
Lawrence Brocchini (LB-2628)
lbrocchini@rpl-law.com
41 Madison Avenue, 41st Floor
New York, New York 10010
Telephone:  (212) 763-4100

*Attorneys for Defendants*
*China North East Petroleum Holdings Limited,*
*Wang Hung Jun, Guizhi Ju and Zhang Yang*


**K&L GATES LLP**

By: /s/ Andrew L. Morrison
    Andrew L. Morrison (AM-1071)
599 Lexington Avenue
New York, New York 10022
Telephone:  (212) 536-3900
Andrew.morrison@klgates.com

**DUNN, NEAL & GERGER, L.L.P.**
S. Loyd Neal, III (*Pro Hac Vice*)
3050 Post Oak Blvd., Suite 400
Telephone:  (713) 403-7404
lneal@dnglegal.com

*Attorneys for Defendant Ralph E. Davis Associates, Inc.*

---

[13] The conformed signatures represent the consent of the parties to the filing of this document, as if each had provided a handwritten signature.