UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re China North East Petroleum Holdings Limited Securities Litigation** | No. 10-CV-04577 MGC |
| **THIS DOCUMENT RELATES TO: ALL ACTIONS** | |

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVE AND CLASS COUNSEL

Jeremy A. Lieberman
Marc I. Gross
Jeremy A. Lieberman
Tamar A. Weinrib
**POMERANTZ LLP**
600 Third Avenue
New York, N.Y. 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665

Patrick V. Dahlstrom
**POMERANTZ LLP**
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184

*Lead Counsel for the Class*

Joseph H. Weiss
James E. Tullman
Mark D. Smilow
**WEISS & LURIE**
551 Fifth Avenue, Suite 1600
New York, N.Y. 10176
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

Laurence M. Rosen
Phillip Kim
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 34th Floor
New York, N.Y. 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827

*Counsel for Plaintiff*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...............................................................................................ii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 2

    A.    China North's Culture of Corruption ................................................... 2

    B.    The Massive Misstatement of Financial Results .................................. 3

        1.    Inflation of Oil Reserves and Future Cash Flows ..................... 4

        2.    Improper Accounting for Warrants .......................................... 5

        3.    Aggregate Impact of Accounting Machinations ....................... 6

        4.    Revelation of Fraud and Stock Price Impact ............................ 6

ARGUMENT ..................................................................................................................... 8

I.    THE CLASS SHOULD BE CERTIFIED PURSUANT TO RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE ...................................................... 8

    A.    Standards for Class Certification ......................................................... 9

    B.    The Rule 23(a) Requirements ........................................................... 10

    C.    The Requirements of Rule 23(b)(3) Are Satisfied .............................. 15

        a)    Class-wide Reliance Is Presumed Under *Affiliated Ute* .......... 16

        b)    Class-wide Reliance Is Presumed Under *Basic* ..................... 18

II.    POMERANTZ SATISFIES THE RULE 23(g) PREREQUISITES FOR APPOINTMENT AS CLASS COUNSEL ...................................................... 24

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*AAL High Yield Bond Fund v. Ruttenberg*,
    229 F.R.D. 676 (N.D. Ala. 2005) ..................................................................... 19, 20

*Affiliated Ute Citizens of Utah v. U. S.*,
    406 U.S. 128 (1972) ........................................................................................... 17

*Amchem Products, Inc. v. Windsor*,
    521 U.S. 591 (1997) .............................................................................. 1, 8, 14, 15

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*,
    133 S. Ct. 1184 (2013) ...................................................................................... 16

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
    222 F.3d 52 (2d Cir. 2000) ............................................................................... 14

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) .......................................................................................... 18

*Billhofer v. Flamel Technologies, S.A.*,
    281 F.R.D. 150 (S.D.N.Y. 2012) ...................................................................... 20

*Blackie v. Barrack*,
    524 F.2d 891 (9th Cir. 1975) ...................................................................... 12, 16

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) ............................................................... 19, 20

*Castillo v. Envoy Corp.*,
    206 F.R.D. 464 (M.D. Tenn. 2002) .................................................................. 21

*Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,
    504 F.3d 229 (2d Cir. 2007) .............................................................................. 10

*City of Livonia Emp'ees.' Ret. Sys. v. Wyeth*,
    284 F.R.D. 173 (S.D.N.Y. 2012) ...................................................................... 17

*Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007) ............................................................................... 22

*Cromer Fin. Ltd. v. Berger*,
    205 F.R.D. 113 (S.D.N.Y. 2001) ...................................................................... 16

*Deutschman v. Beneficial Corp.*,
    841 F.2d 502 (3d Cir. 1988)...................................................................... 21, 22

*Dietrich v. Bauer*,
    192 F.R.D. 119 (S.D.N.Y. 2000) ................................................................... 11

*Dirks v. Clayton Brokerage Co. of St. Louis Inc.*,
    105 F.R.D. 125 (D. Minn. 1985).................................................................... 22

*Eisenberg v. Gagnon,*
    766 F.2d 785 (3d Cir. 1985)............................................................................ 9

*Epifano v. Boardroom Bus. Products, Inc.*,
    130 F.R.D. 295 (S.D.N.Y. 1990) ..................................................................... 9

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    131 S. Ct. 2179 (2011)................................................................................... 16

*Fogarazzao v. Lehman Bros., Inc.*,
    232 F.R.D. 176 (S.D.N.Y. 2005) ................................................................... 17

*Fogarazzo v. Lehman Bros., Inc.*,
    263 F.R.D. 90 (S.D.N.Y. 2009) ..................................................................... 17

*Gen. Tel. Co. of Sw. v. Falcon,*
    457 U.S. 147 (1982)....................................................................................... 13

*Haddock v. Nationwide Fin. Servs., Inc.*,
    262 F.R.D. 97 (D. Conn. 2009)...................................................................... 11

*In re Accredo Health, Inc. Sec. Litig.*, 03-2216 DP,
    2006 WL 1716910 (W.D. Tenn. Apr. 19, 2006)............................................ 21

*In re Agent Orange Prod. Liab. Litig. MDL No. 381*,
    818 F.2d 145 (2d Cir. 1987)........................................................................... 11

*In re Baldwin-United Corp. Litig.*,
    122 F.R.D. 424 (S.D.N.Y. 1986) ................................................................... 13

*In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income*
*Sec. Act (ERISA) Litig.*,
    281 F.R.D. 134 (S.D.N.Y. 2012) ................................................................... 10

*In re Beacon Assoc. Litig.*,
    282 F.R.D. 315 (S.D.N.Y. 2012) ................................................................... 16

*In re Blech Sec. Litig.*,
    187 F.R.D. 97 (S.D.N.Y. 1999) ................................................................ 2, 10

*In re Countrywide Fin. Corp. Sec. Litig.*,
    273 F.R.D. 586 (C.D. Cal. 2009) ................................................................ 19

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    529 F. Supp. 2d 644 (S.D. Tex. 2006) ...................................................... 22

*In re Fannie Mae 2008 Sec. Litig.*,
    891 F. Supp. 2d 458 (S.D.N.Y. 2012), ...................................................... 16

*In re Fed. Home Loan Mortgage Corp. (Freddie Mac) Sec. Litig.*,
    281 F.R.D. 174 (S.D.N.Y. 2012) ............................................................... 20

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    245 F.R.D. 147 (S.D.N.Y. 2007) ............................................................... 12

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009) ................................................................. 12, 13

*In re IGI Sec. Litig.*,
    122 F.R.D. 451 (D.N.J. 1988) .................................................................. 13

*In re Indep. Energy Holdings PLC Sec. Litig.*,
    210 F.R.D. 476 (S.D.N.Y. 2002) ............................................................. 1, 9

*In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, MLD 1658 SRC,
    2013 WL 396117 (D.N.J. Jan. 30, 2013) .............................................. 16, 22

*In re NASDAQ Market-Makers Antitrust Litig.*,
    169 F.R.D. 493 (S.D.N.Y. 1996) ............................................................... 16

*In re Oxford Health Plans, Inc.*,
    191 F.R.D. 369 (S.D.N.Y. 2000) ............................................................... 13

*In re Prudential Sec. Inc. Ltd. Partnerships Litig.*,
    163 F.R.D. 200 (S.D.N.Y. 1995) ............................................................... 11

*In re Sanofi-Aventis Sec. Litig.*, No. 07 Civ. 10279,
    2013 WL 1149672 (S.D.N.Y. Mar. 20, 2013) ........................................... 17

*In re Scientific-Atlanta, Inc. Sec. Litig.*,
    571 F. Supp. 2d 1315 (N.D. Ga. 2007) .................................................... 22

*In re SCOR Holding (Switzerland) AG Litig.*,
    537 F. Supp. 2d 556 (S.D.N.Y. 2008) ................................................. 12, 23

*In re Smith Barney Transfer Agent Litig.*,
    290 F.R.D. 42 (S.D.N.Y. 2013) ........................................................... 17, 18

*In re Sumitomo Copper Litig.*,
    182 F.R.D. 85 (S.D.N.Y. 1998) ........................................................................... 13

*In re Top Tankers, Inc. Sec. Litig.*, 06 CIV. 13761 (CM),
    2008 WL 2944620 (S.D.N.Y. July 31, 2008) ......................................................... 1

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001)................................................................................ 14

*In re Vivendi Universal, S.A.*,
    242 F.R.D. 76 (S.D.N.Y. 2007) .............................................................. 10, 11, 23

*In re Winstar Commun. Securities Litig.*,
    290 F.R.D. 437 (S.D.N.Y. 2013) .................................................................. 19, 21

*In re WorldCom, Inc. Sec. Litig.*,
    219 F.R.D. 267 (S.D.N.Y. 2003) .................................................................... 2, 23

*In re Xcelera.com Sec. Litig.*,
    430 F.3d 503 (1st Cir. 2005) ........................................................................ 19, 21

*Marisol A. v. Giuliani*,
    126 F.3d 372 (2d Cir. 1997)................................................................................ 10

*Maywalt v. Parker & Parsley Petroleum Co.*,
    147 F.R.D. 51 (S.D.N.Y. 1993) ............................................................................ 2

*Menkes v. Stolt-Nielsen S.A.*,
    270 F.R.D. 80 (D. Conn. 2010)................................................................. 10, 11, 22

*Padilla v. Maersk Line, Ltd.*,
    271 F.R.D. 444 (S.D.N.Y. 2010) ........................................................................ 16

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985).............................................................................................. 8

*Simpson v. Specialty Retail Concepts*,
    823 F. Supp. 353 (M.D.N.C. 1993) ..................................................................... 20

*Stengle v. American Italian Pasta Co.*,
    2005 U.S. Dist. LEXIS 43816 (W.D. Mo. Dec. 19. 2005) .................................... 24

*Teachers' Ret. Sys. of Louisiana v. ACLN Ltd.*, 01 CIV. 11814 (LAP),
    2004 WL 2997957 (S.D.N.Y. Dec. 27, 2004) ...................................................... 13

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    546 F.3d 196 (2d Cir. 2008)............................................................................ 9, 20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ............................................................................ 23

*Trief v. Dun & Bradstreet Corp.*,
   144 F.R.D. 193 (S.D.N.Y. 1992) ......................................................... 9

*UFCW Local 1776 v. Eli Lilly & Co.*,
   620 F.3d 121 (2d Cir. 2010) ............................................................... 15

*Vinh Nguyen v. Radient Pharm. Corp.*,
   287 F.R.D. 563 (C.D. Cal. 2012) ....................................................... 21

*Wagner v. Barrick Gold Corp.*,
   251 F.R.D. 112 (S.D.N.Y. 2008) ................................................. 11, 12

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) ........................................................................ 9

## STATUTES

15 U.S.C. § 78j ....................................................................................... 1

15 U.S.C. § 78t ....................................................................................... 1

## RULES

Fed. R. Civ. P. 23 ........................................................................... *passim*

## REGULATIONS

17 C.F.R. § 240.10b-5 ........................................................................... 1

Lead Plaintiff Acticon A.G. ("Lead Plaintiff") submits this memorandum in support of its motion for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Lead Plaintiff seeks certification of the following Class:

> All purchasers of China North East Petroleum Holdings Limited securities, during the period from May 15, 2008 through and including May 26, 2010 (the "Class Period");[1]

Lead Plaintiff also seeks appointment of Acticon A.G. as Class Representative and the appointment of Lead Counsel, Pomerantz LLP ("Pomerantz") ("Lead Counsel") as Class Counsel.

Lead Plaintiff's Consolidated Class Action Complaint, (the "Complaint" or "CAC") was filed on January 14, 2011 (Dkt. # 39).  It asserts securities fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j[b], 15 U.S.C. § 78t[a], and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).   Courts have consistently held that such claims are especially amenable to class certification.  *See*, *e.g.*, *In re Indep. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 479 (S.D.N.Y. 2002)(Class action treatment is "particularly appropriate" for securities fraud claims, and under such circumstances courts should err in favor of certifying a class).  *See also Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 624 (1997); *In re Top Tankers, Inc. Sec. Litig.*, 06 CIV. 13761 (CM), 2008 WL 2944620 (S.D.N.Y. July 31, 2008).

In this class action, Lead Plaintiff seeks to prove that it, like other Class members, was injured by a common course of misconduct — the issuance of false material misrepresentations

---

[1] Excluded from the Class are Defendants, officers and directors of China North East Petroleum Holdings Limited members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

and omissions by China North East Petroleum Holdings ("China North"), Limited, Wang Hung Jun, Zhang Yang, Ralph E. Davis Associates, Inc., Robert C. Bruce, Ju Guizhi, Edward M. Rule, Li Jing Fu, and Yu Li Guo during the Class Period.

Significantly, "it is well recognized that private enforcement of the securities laws is a necessary supplement to government regulation." *In re Blech Sec. Litig.*, 187 F.R.D. 97, 102 (S.D.N.Y. 1999). "[T]he Second Circuit . . . has explicitly noted its preference for class certification in securities cases and the importance of such certification for small securities holders located throughout the country." *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 54 (S.D.N.Y. 1993) (citations omitted).  In this case, the individual members of the Class have relatively small damages and will be left without any redress for defendants' egregious violations of the Exchange Act unless this action proceeds as a class action.  *See In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 304 (S.D.N.Y. 2003) (finding that, absent class certification, the burden and expense on individual investors of litigating independent actions against well financed defendants would leave most investors "without any recourse").

As detailed below, this action satisfies all the requirements for class certification under Rule 23(a) — numerosity; commonality; typicality; and adequacy of representation.  This action also satisfies the two core requirements for certification under Rule 23(b)(3): predominance of common questions of law or fact and superiority of a class action over other available methods for adjudication.  Thus, class certification is eminently warranted.

## STATEMENT OF FACTS

### A.      China North's Culture of Corruption

China North is a Nevada Corporation with principal offices located in New York.  The Company has twenty-year lease agreements with PetroChina Company ("PetroChina") for the

extraction of oil from four different oilfields, the production of which is then sold to PetroChina for marketing in China.  ¶ 31.[2]

During the Class Period, China North was a closely knit company.  Until their ouster, Defendant Wang, the Company's Chairman and CEO, and his family members, exercised unfettered control over China North's operations and financial reporting.  ¶ 3, ¶ 24.  Both Wang's mother, Defendant Ju, and brother, Defendant Yu, served as Directors of the Company. ¶ 23, ¶¶ 26, 29.  The Company's Chief Financial Officer, Defendant Zhang was a mere 27 years old.

Wang and his mother pilfered China North's coffers for "business development" purposes, the revelation of which resulted in Wang's placement on "administrative leave" (where he remains to this day); resignation of his mother, brother and CFO; and the "noisy" resignation of the Chair of the Company's Audit Committee, defendant Bruce, whereby he urged the Company to conduct a further investigation into GAAP violations in addition to those relating to the restatement, as well as potential violations of the Foreign Corrupt Practices Act.  ¶ 32.

### B.    The Massive Misstatement of Financial Results

Given this corporate culture, it is not surprising that a massive financial fraud occurred. As detailed below, Defendants inflated the size and value of the Company's proved oil reserves and future net cash flows, and failed to recognize impairment charges related to the decrease of such reserves, thereby materially inflating reported income.  Defendants also failed to recognize the increased cost of warrants issued to an investor, as mandated by Generally Accepted Accounting Principles ("GAAP") when the price of China North stock climbed during the Class Period.  ¶ 41.

---

[2] All "¶ __" citations are references to numbered paragraphs in the CAC.

1.    **Inflation of Oil Reserves and Future Cash Flows**

In its Form 10-K for 2008 (the "2008 10-K"), China North reported proved oil reserves of 5.5 million barrels and future net cash flows therefrom of $244 million.   The Company also represented that Davis made these calculations "in accordance with generally accepted petroleum engineering and evaluation principles in conformity with SEC definitions and guidelines." Significantly, Davis expressly consented to the use of its computations and the reference to its work in a letter dated March 17, 2009, affixed as an Exhibit to the Company's 2008 10-K. (Declaration of Anthony F. Maul, dated April 6, 2011, ("Maul Decl.") Ex. 1 at F-22-23 (Dkt. #63)); *see also* ¶ 105.

Moreover, the 10-K represented that these calculations were based on "prices and costs as of the date the estimate is made."  (Maul Decl. Ex. 1 at 24.)  The Company made an identical representation in its 10-Q for the first quarter of 2009.

These results were materially false and misleading.   GAAP requires oil and gas companies to perform "ceiling test calculations" to determine whether anticipated net revenues from a given property meet or exceed the property's capitalized costs and expenses.  If not, GAAP compels recognition of an impairment charge.  ¶ 43.

However, these reported figures were wildly inflated.  The original and restated proved oil reserves and future cash flows as of December 31, 2008 were as follows:

|  | Barrels (Bbls) | Future Cash Flow | Carrying Value | Impairment |
|---|---|---|---|---|
| **Original** | 5,500,000 | $244,400,000 | $70,200,000 | $0 |
| **Restated** | 4,400,000 | $197,000,000 | $54,300,000 | $13,200,000 |
| **Difference** | -1,100,000 | -$47,400,000 | -$15,900,000 | $13,200,000 |
| **Difference** | -25% | -19.4% | -29% | N/A |

4

As indicated in the chart above, due to the Company's overstatement of proved oil reserves and future net cash flows, China North was able to avoid a $13.2 million impairment on its oil properties for 2008. Similarly, in the first quarter of 2009, the Company failed to record a $13.834 million impairment on its oil fields, thereby further inflating reported earnings.

The Company's explanation for this restatement was shocking: it failed to account for the steep declines in oil prices occurring in the fourth quarter of 2008 and the first quarter of 2009. In the Company's own words:

> Due to the significant decline in oil prices during the fourth quarter of 2008 and the continued decline in prices for the first quarter of 2009 . . . the Company has recognized impairment charges and corresponding reductions in the carrying value of those net capitalized costs of $13,184,103 and $13,825,567, as of December 31, 2008 and March 31, 2009, respectively.

China North East Petroleum Holdings Limited, Form 10-Q/A (Sept. 1, 2010) at 11. The Company further stated that the impairment charge for the year ended December 31, 2008 was "due to a significant decline in the oil price used in the *reserve report*" (Maul Decl. Ex. 2 at 18 (emphasis added)) — thereby implicating Davis' role in the Company's inflation of earnings. (Maul Decl. Ex. 2 at F-12).

The size of these overstatements, and the admission that they were due to a failure to account for the decline in the price of oil in those periods — a fact that could be easily determined by any lay person — readily establishes both Davis' and China North's scienter.

### 2. Improper Accounting for Warrants

On March 3, 2008, the Company announced a Purchase Agreement whereby Lotusbox Investments, Ltd. ("Lotusbox") agreed to pay $15 million for China North debentures and stock warrants exercisable at $3.20 and $3.45 per share. ¶ 51. The Company classified the Warrants "as liability instruments in accordance with Paragraph 8 of EITF 00-19." ¶ 55. There is no

dispute that EITF 00-19 requires such debt instruments (in contrast to equity) to be marked to market at the end of each reporting period. ¶ 53. Thus, if China North's share price increased in a given period, the Company was required to record a charge on its income statement to reflect the increased cost of the Company's obligations to Lotusbox if the Warrants were exercised. *Id.*

China North's shares, fueled by inflated reserve valuations, indeed rose to over $11 per share by January 2010 — well above the Warrants' exercise price. This rise should have resulted in a charge against earnings equal to the difference between the Warrants' exercise price and the stock price totaling $9,805,886 in the first three quarters of 2009. ¶¶ 56-57. The charge was recognized as part of the restatement. Defendants' failure to take this charge during the Class Period was a clear disregard of the obvious, further evidencing their scienter.

### 3. Aggregate Impact of Accounting Machinations

As a result of Defendants' accounting manipulations, China North overstated its net profit by $36.16 million for 2008 and the first three quarters of 2009. ¶ 59. The restatement wiped out the Company's entire reported Class Period earnings of $28.8 million.

### 4. Revelation of Fraud and Stock Price Impact

Defendants' rampant fraud was revealed through a series of partial disclosures, all of which triggered sharp drops in the Company's share price, on unusually high trading volume, as detailed below:

- **February 23, 2010** — After the market closed, China North announced that its financial statements for year end 2008 and the first three quarters of 2009 contained material misstatements due to unrecognized oil property impairments and warrant related expenses, the size of which was not quantified. ¶ 86.

  **Market Reaction: The next day,** China North's stock price fell $0.69 per share, or more than 7%, from $9.37 to $8.69, on trading volume in excess of 1.7 million shares, approximately 250% of its average volume for the three month period ending February 23. ¶ 87. In comparison, the S&P 500 Index increased by nearly 1% that day, and the index tracking AMEX listed stocks (the "XAX Index"), where China North is listed, gained 0.19%.

6

Consistent with the prior revelations, on March 8, 2010, the Company estimated that the forthcoming restatement would increase 2008 income by $2.5 million and decrease 2009 income by approximately $23 million, thereby reducing, but not eliminating, previously reported earnings.  ¶ 88; *see also* (Declaration of Michael J. Coffino in Support [of the] Motion to Dismiss the Consolidated Class Action Complaint ("Coffino Decl.") Ex. 7 (Dkt. #59)). Defendant Wang assured investors that the worst was behind the Company and that China North would file its current financial reports "toward the end of March."  PRNewswire-Asia-FirstCall, *China North East Petroleum Clarifies Non-Cash Accounting Adjustments* (Mar. 8, 2010) (emphasis added), *available at* http://tinyurl.com/3p6f8ot.   Given these reassurances, the market's reaction was minimal.

- **April 15-16, 2010** — Restoration of confidence in the Company was short-lived.  On April 15, China North announced that despite its earlier representation that its current financial statements would be complete "toward the end of March," the Company announced that its restatement would be further delayed followed the next day by disclosure of foul play concerning "certain expenditures relating to business development activities."  ¶ 92; (Coffino Decl. Ex. 9).

  **Market Reaction:**  Over the three days following April 15, China North shares plummeted by $1.77, or more than 17%, (from $9.85 to $8.08).  In contrast, the S&P 500 Index declined by less than 1%, and the XAX Index declined by less than 2%.  A-42 ¶ 93.  The average trading volume on these three days was 1.54 million, more than 220% of its average trading volume for the preceding three month period. [3]

**May 27, July 22 & September 1, 2010 Disclosures**

- **May 27, 2010** — Trading in China North shares was halted on May 25, 2010, due to the Company's continued failure to file current financials.  On May 27, 2010, the Company announced that an Audit Committee investigation had determined that throughout 2009, unauthorized cash transfers had occurred between the Company and the personal bank accounts of China North's CEO, Defendant Wang, and his mother, Defendant Ju.  Defendants were respectively placed on "administrative leave" and forced to resign.   ¶ 98; (Coffino Decl. Ex. 12).

---

[3] On April 20, 2010, China North filed a Form 8-K/A increasing its anticipated restatement to $28.3 million. (Coffino Decl. Ex. 11).

- **July 22, 2010** — The Chairman of China North's Audit Committee submitted a letter to the Board of Directors, citing among other things, "*a very large number and amount of unauthorized transfers of Company funds*" from the Company to Defendants Wang and Ju, and "documented massive internal control failures" at the Company during the Class Period, all of which belied prior representations pursuant to Section 302 of Sarbanes-Oxley regarding the adequacy of China North's internal controls. ¶¶ 32-39, 58, 99; (Coffino Decl. Ex. 27).

- **September 1, 2010** — the Company finally filed its restated financial reports, wherein it disclosed for the first time that the restatement totaled $36.1 million, eviscerating all of China North's reported profits for the Class Period. ¶ 59; (Coffino Decl. Exs. 4, 17-19).

**Market Reaction:**  Trading did not resume until September 9, 2010, at which point China North's share price plummeted 19.6%, from $5.50 to $4.42 per share, on extraordinarily high trading volume of 2.1 million shares.  In contrast, the S&P 500 Index increased by 0.48%, and the XAX Index was flat.

For the entire disclosure period from February 23, 2010 through September 9, 2010, China North's shares plummeted 47%.  In contrast, the S&P Index gained slightly, and the XAX index fell 1%.  *Id.*  On January 20, 2012, shares closed at $2.57, well below the price prior to the 2010 revelations.

## ARGUMENT

## I.  THE CLASS SHOULD BE CERTIFIED PURSUANT TO RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE

To certify a putative class, the Court must determine whether four threshold requirements of Federal Rule 23 (a) are met: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Amchem Products, Inc.*, 521 U.S. 613.  In addition, the Court must determine whether the action is maintainable under Fed. R. Civ. P. 23(b)(1), (2) or (3).  *Id.* at 614. Class actions promote judicial economy by aggregating small claims into one lawsuit. "Class actions … permit the plaintiffs to pool claims which would be uneconomical to litigate individually. [M]ost of the plaintiffs would have no realistic day in court if a class action were not available." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 808-809 (1985). "The preponderance of the

evidence standard applies to evidence proffered to establish Rule 23's requirements." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008). In this case, all of the criteria of Rule 23 (a) and (b) are met. Lead Plaintiff is a member of the proposed Class and class treatment of these claims is appropriate.

It is well settled that "[t]here is a strong public policy in favor of private enforcement of the nation's securities laws. A class action is both an effective and appropriate method for resolving securities law claims." *See Epifano v. Boardroom Bus. Products, Inc.*, 130 F.R.D. 295, 298 (S.D.N.Y. 1990) (citations omitted); *In re Indep. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 479 (S.D.N.Y. 2002) (Class action treatment is "particularly appropriate" for securities fraud claims); *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 197 (S.D.N.Y. 1992) (same). Indeed, courts have repeatedly acknowledged that "[b]ecause of the usefulness of class actions in addressing allegations of securities fraud, the class certification requirements of Rule 23 are to be construed liberally." *Darquea v. Jarden Corp.*, 06 CIV. 722 CLB, 2008 WL 622811 at *4 (S.D.N.Y. Mar. 6, 2008) (citation omitted). In a securities fraud action, if a court is in doubt as to whether to certify a class action, it should err in favor of certification. *See In re Indep. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 479 (S.D.N.Y. 2002); *see also Eisenberg v. Gagnon,* 766 F.2d 785 (3d Cir. 1985)("The interests of justice require that in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing a class action."). Here, the Complaint alleges precisely the type of securities fraud claims which have been routinely certified as class actions.

A.   **Standards for Class Certification**

In light of the U.S. Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), a court of the Southern District of New York has clarified the standard for class certification as follows:

Certification of a class is proper "only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." The party moving to certify bears the burden of satisfying Rule 23(a) … Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. However, "in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement." The Court has discretion on questions of class certification because "the district court is often in the best position to assess the propriety of the class and has the ability . . . to alter or modify the class, create subclasses, and decertify the class whenever warranted." Similarly, "district courts retain 'ample discretion' to limit discovery and 'the extent of the hearing' on Rule 23 issues 'in order to assure that a class certification motion does not become a pretext for a partial trial of the merits.'"

*In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 138 (S.D.N.Y. 2012)(Castel, J.) (internal citations omitted)].

**B.    The Rule 23(a) Requirements**

1.    **The Proposed Class Is So Numerous That Joinder of All Members Is Impracticable**

Rule 23(a)(1) requires that the class be so numerous that joinder of all members would be "impracticable." Impracticable does not mean impossible, but only that the difficulty of joining all class members make use of the class action appropriate. *Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244-45 (2d Cir. 2007). Further, a plaintiff need not allege the exact number or identity of class members. *See In re Blech Sec. Litig.*, 187 F.R.D. 97, 103 (S.D.N.Y. 1999). "Joinder is generally presumed to be impracticable when a putative class exceeds 40 members." *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 90 (D. Conn. 2010), *citing Marisol A. v. Giuliani*, 126 F.3d 372 (2d Cir. 1997).

"[I]n securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Vivendi Universal, S.A.*,

10

242 F.R.D. 76, 83 (S.D.N.Y. 2007)(collecting cases) (citation omitted); *accord Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 116 (S.D.N.Y. 2008).

A review of publicly-available information reveals that during the Class Period, on average, 1,743,866 China North shares were traded weekly on the NYSE AMEX. In addition, the amount of China North stock outstanding during the Class Period ranged from 19,224,000 to 25,852,000 shares. The NYSE AMEX is an active and efficient national market exchange. Although Lead Plaintiff has not at this time ascertained the precise number of potential Class members, it believes that there are many hundreds, if not thousands, of geographically dispersed members of the proposed Class. The precise identity of the members can be readily identified from the Company's books and records. Clearly, the proposed Class consists of a sufficient number of persons (*i.e.*, more than 40) to make joinder impracticable. *See Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 90 (D. Conn. 2010).

## 2.  Questions of Law or Fact Are Common to the Class

The Rule 23(a)(2) requirement that "there are questions of law or fact common to the class" is a "low hurdle" that is "easily surmounted." *See In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 163 F.R.D. 200, 206 n.8 (S.D.N.Y. 1995). *See also Dietrich v. Bauer*, 192 F.R.D. 119, 124 (S.D.N.Y. 2000) commonality requirement "has been applied permissively by courts in the context of securities fraud litigation"). Commonality "is established so long as the plaintiffs can identify some unifying thread among the [class] members' claims." *Haddock v. Nationwide Fin. Servs., Inc.*, 262 F.R.D. 97, 116 (D. Conn. 2009) *vacated and remanded sub nom. Nationwide Life Ins. Co. v. Haddock*, 460 F. App'x 26 (2d Cir. 2012). Even a single common legal or factual question will suffice. *See In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 145, 166, 67 (2d Cir. 1987).

Common issues are prevalent in this case, including:

- whether Defendants' violated the federal securities laws by their acts as alleged in the Complaint;

- whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the business, operations and management of China North;

- whether the Individual Defendants caused China North to issue false and misleading financial statements during the Class Period;

- whether the Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of China North securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

In comparable situations, courts have consistently found the commonality requirement to have been satisfied. *See, e.g., In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 571 (S.D.N.Y. 2008); *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112 (S.D.N.Y. 2008); *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 116 (S.D.N.Y. 2008); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 157-158 (S.D.N.Y. 2007) *order aff'd in part, vacated in part*, 574 F.3d 29 (2d Cir. 2009). Indeed, here, like all Section 10(b) cases, the commonality of the shareholders' claims is self-evident:

"Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit."

*Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975)(citations omitted).

### 3.   Lead Plaintiff's Claims Are Typical of the Class

Rule 23(a)(3) mandates that the claims of the representative plaintiff be typical of the claims of the class.  The Supreme Court has acknowledged that the "commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157-58 n. 13 (1982).  "Typicality does not require that the situations of the named representatives and the class members be identical." *In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 375 (S.D.N.Y. 2000) (citation omitted); *see also In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 94 (S.D.N.Y. 1998).

The focus of the inquiry is on defendants' actions, not on plaintiff's behavior.  *See, e.g.*, *Teachers' Ret. Sys. of Louisiana v. ACLN Ltd.*, 01 CIV. 11814 (LAP), 2004 WL 2997957 (S.D.N.Y. Dec. 27, 2004); *In re IGI Sec. Litig.*, 122 F.R.D. 451, 456 (D.N.J. 1988). Nevertheless, Lead Plaintiff also meets Rule 23(a)'s typicality requirement.  A plaintiff's claim is typical if it arises from "the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009).  In other words:

> Because this inquiry focuses on the nature of the claims asserted, factual differences involving the date, type and manner of the purchase, the investors perception of the transaction, or even the information furnished to him at the time will not destroy typicality if each class member was the victim of the same material omissions and the same consistent course of conduct.

*In re Baldwin-United Corp. Litig.*, 122 F.R.D. 424, 428 (S.D.N.Y. 1986)(citations omitted).

In this case, typicality is satisfied because:

1) Lead Plaintiff claims that Defendants knowingly issued false and misleading statements and omitted from disclosure material facts concerning their true financial condition. Proof of these allegations is common to all Class Members because Defendants' statements were uniformly made to all Class Members and the material omissions equally affected all Class Members;

13

2) Defendants' state of mind when making the false and misleading statements (*i.e.*, scienter) is not a plaintiff-specific inquiry;

3) The question of whether the market price of the Company's stock was artificially inflated during the Class Period due to the alleged misstatements and omissions involves no individualized issues; and

4) Lead Plaintiff's claims are typical of those of the Class. The conduct that injured Lead Plaintiff also injured the other Class Members. Similarly, the injury that Lead Plaintiff suffered is similar to that suffered by other Class Members; and

5) There is nothing unique about the proof that any plaintiff would proffer to prove that the Individual Defendants were "control persons" within the meaning of Section 20(a) of the Exchange Act.

Thus, the Complaint raises numerous common questions of law and fact shared by all Class members.

### 4.   Lead Plaintiff Will Fairly and Adequately Protect the Interests of the Class

The Rule 23(a)(4) requirement that "the representative parties will fairly and adequately protect the interests of the class" is unquestionably met. The focus of a court's inquiry is "whether: 1) plaintiff's interests are antagonistic to other class members'; and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) (citation omitted). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products, Inc.*, 521 U.S. 625 (citation omitted). It is important to emphasize that "the conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental, and speculative conflict should be disregarded at the class certification stage." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001) (citations omitted). Here, Lead Plaintiff "possess[es] the same interest and suffered[ed]

14

the same injury as the class members," *Amchem Products, Inc*, 521 U.S. at 625-26, and no actual or potential conflicts exist.

Further, Lead Plaintiff has been diligent in monitoring this litigation, including regularly communicating with Lead Counsel and reviewing documents filed with the Court on behalf of the Class. Appointment of the Pomerantz as Class Counsel also militates in favor of the Lead Plaintiff's adequacy. Pomerantz has extensive experience in the field of securities litigation. Pomerantz's resume, attached hereto, reflects its expertise in the field. Moreover, Lead Counsel's vigorous pursuit of the Class's interests is well documented in its advancement of the Class's claims before this Court.

### C.   The Requirements of Rule 23(b)(3) Are Satisfied

Rule 23(b)(3) requires that common questions of law or fact predominate over individual questions and that a class action is superior to other available methods of adjudication. Both of the Rule's requirements have been met.

### 1.   Common Questions of Law and Fact Predominate

"The predominance test is readily met in certain cases alleging consumer or securities fraud. . . ." *Amchem Products, Inc.*, 521 U.S. at 625. "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *See UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 131 (2d Cir. 2010); *see also* ("[T]o allow various secondary issues of plaintiff's claim to preclude certification of a class would render the rule an impotent tool for private enforcement of the securities laws."). For example, it is well established that where

liability can be proved class-wide, individualized proof of damages does not defeat predominance.[4]

Lead Plaintiff will prove, on a common basis, the elements of its Sections 10(b)[5] and 20(a) claims.[6]  "Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011).[7]  Here, two separate presumptions of class-wide reliance apply to the facts of this case – *Affiliated Ute* and the *Basic* fraud-on-the-market doctrine.

### a)  Class-wide Reliance Is Presumed Under *Affiliated Ute*

To prevail on their Section 10(b) claim, plaintiffs must show "transaction causation," *i.e.,* that they relied upon defendants' material misstatements and/or omissions in connection with their decision to purchase of China North securities.  Because proof of reliance on something that

---

[4]  *See, e.g., Blackie*, 524 F. 2d at 905; *Padilla v. Maersk Line, Ltd.*, 271 F.R.D. 444, 450 (S.D.N.Y. 2010); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 514 (S.D.N.Y. 1996).

[5]  The elements of a claim for securities fraud under Section 10(b) are: (1) a material omission or misrepresentation; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.

[6]  In addition to an underlying Section 10 violation by a controlled entity, Section 20(a) liability requires control of the primary violator by the defendant and culpable participation in the primary violation.  *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 473 (S.D.N.Y. 2012), *aff'd*, 12-3859, 2013 WL 1982534 (2d Cir. May 15, 2013).  As with Section 15, because the defendants' conduct is the focus of both the control and culpable participation inquiries, it can be proved class-wide.  *See In re Beacon Assoc. Litig.*, 282 F.R.D. 315, 333 (S.D.N.Y. 2012).

[7]  Aside from reliance and damages (as to which individual issues do not defeat predominance), courts routinely find that the other elements can be proved with common evidence.  *See In re Merck & Co., Inc., Sec., Deriv. & ERISA Litig.*, MDL No. 1658 (SRC), 2013 WL 396117, at *12 (D.N.J. Jan. 30, 2013)("Defendants' liability will depend on the same evidence relating to the materiality of the misstatements and omissions at issue and Defendants' state of mind in making such statements or failing to disclose certain information …  In addition …, loss causation for the putative class is also capable of proof through common evidence. Each class member's claim for relief is based on the same corrective disclosures …"); *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 127 (S.D.N.Y. 2001) ("With one exception, [reliance] there is no dispute that each element necessary to establish liability … is common to the class … The proof for the claims of misrepresentation or omission, materiality, and [Defendant's] scienter are all based on a common nucleus of facts and a common course of conduct").  Because merits determinations are to be eschewed, the Supreme Court has recently confirmed that neither materiality nor loss causation has to be proved at the class certification stage to trigger *Basic*'s presumption of reliance.  *See Amgen Inc. v. Connecticut Ret. Plans & Trust Funds,* 133 S. Ct. 1184, 1195-96 (2013) (materiality); *Halliburton*, 131 S. Ct. 2179 at 2185-86 (loss causation).

was *not* said would require a plaintiff "to show a speculative set of facts, *i.e.*, how he would have behaved if omitted material information had been disclosed, [this would] place[ ] an unrealistic evidentiary burden on the 10(b) plaintiff." *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42 (S.D.N.Y. 2013). Consequently, more than 40 years ago, the Supreme Court held that an "obligation to disclose and th[e] withholding of a material fact establish the requisite element of causation." *Affiliated Ute Citizens of Utah v. U. S.*, 406 U.S. 128, 153-54 (1972).

The *Affiliated Ute* presumption remains vital today, and is often employed in federal securities litigation to support a finding of class-wide reliance where defendants with a duty to disclose fail to provide material facts to investors.[8] Although the presumption applies in cases "involving primarily a failure to disclose," *Affiliated Ute Citizens of Utah*, 406 US at 153, as opposed to misrepresentation cases, as the *Smith Barney* court aptly noted, this distinction "is often illusory" because "[a] statement is misleading when it omits the truth." *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42 (S.D.N.Y. 2013). Nor does merely counting whether more misrepresentations or more omissions are alleged suffice to determine whether the *Affiliated Ute* presumption applies. *Id.* Even "where plaintiffs' claims are based on a combination of omissions and misstatements," courts will apply the *Affiliated Ute* presumption. *See Fogarazzao v. Lehman Bros., Inc.*, 232 F.R.D. 176, 186 (S.D.N.Y. 2005).

This case is primarily focused on the following omissions (i) the net carrying value of the Company's oil properties were materially overstated; (ii) the decline of the value of such properties below their capitalized costs was not recorded as an expense in the period incurred, thereby inflating the Company's reported net income; (iii) in addition, as of year end 2008, the

---

[8] *See, e.g., In re Sanofi-Aventis Sec. Litig.*, No. 07 Civ. 10279, 2013 WL 1149672, at *6 n. 8 (S.D.N.Y. Mar. 20, 2013); *Smith Barney*, 2013 WL 1150737, at *7; *City of Livonia Emp'ees.' Ret. Sys. v. Wyeth*, 284 F.R.D. 173, 183 (S.D.N.Y. 2012); *Fogarazzo v. Lehman Bros., Inc.*, 263 F.R.D. 90, 102 (S.D.N.Y. 2009).

size of the Company's proven oil reserves was materially overstated; (iv) losses associated with warrants issued to Lotusbox were not properly recognized, thereby inflating net income for 2009; (v) statements by Defendants regarding the adequacy of internal controls failed to account for rampant pilfering of the Company's cash coffers by its CEO and related Director; and (vi) statements by Defendants regarding the adequacy of internal controls failed to disclose that the Company's internal controls were insufficient to insure that the Company did not violate the FCPA.   But for these material omissions, it is highly likely that investors would not have purchased China North securities at the prices they paid, and plaintiffs are entitled to *Affiliated Ute*'s class-wide presumption of reliance arising from defendants' omission of these critical facts.

### b)  Class-wide Reliance Is Presumed Under *Basic*

Just as it is an "unrealistic evidentiary burden" to require an entire class to prove what they would have done had an omitted fact been disclosed, *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42 (S.D.N.Y. 2013), it is equally impracticable to require an entire class of investors to prove their reliance on specific misstatements.   By shifting the inquiry into one concerning price movements, class-wide reliance can be shown, using common proof, under the fraud-on-the-market theory.   As explained in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988):

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements."

*Id.* at 241-42 (citation omitted, alterations in the original).   The Court further explained:

> An investor, who buys or sells stock at the price set by the market does so in reliance on the integrity of that price.   Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action.

18

*Id.* at 247.  To invoke the fraud-on-the market-presumption, "plaintiffs must demonstrate that (1) the alleged material misstatements were publically known, (2) that the security traded on an efficient market, and (3) that the plaintiff purchased his shares between the time the misleading statement was made and the time the truth was revealed."  *In re Winstar Commun. Securities Litig.*, 290 F.R.D. 437 (S.D.N.Y. 2013).Lead Plaintiff can demonstrate all three.

   In *Cammer v. Bloom*, 711 F. Supp. 1264, 1276 (D.N.J. 1989), the court set forth certain factors to use to determine whether the market for any stock is open and efficient: (1) whether there "existed an average weekly trading volume during the class period in excess of a certain number of shares," to wit, 1% for a "substantial presumption" of efficiency, 2% turnover for a "strong presumption" (*Id.* at 1293); (2) whether "a significant number of securities analysts followed and reported on [the] company's stock during the class period"; (3) whether the company's stock "had numerous market makers";[9] (4) whether "the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met"; and (5) whether "empirical facts show[ ] a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Id*. at 1284-87. However, the so-called *Cammer* factors are not exclusive, and plaintiff "is not required to show the existence of each of these factors" to establish market efficiency. *AAL High Yield Bond Fund v. Ruttenberg*,

---

[9] A market maker is one who helps establish a market for securities by reporting bid-and-asked quotations (the price a buyer will pay for a security and the price a seller will sell a security) and who stands ready to buy or sell at these publicly quoted prices. *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 515 (1st Cir. 2005); *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 613-614 (C.D. Cal. 2009).

229 F.R.D. 676, 683 (N.D. Ala. 2005) (citations omitted); *see also Simpson v. Specialty Retail Concepts*, 823 F. Supp. 353, 355 (M.D.N.C. 1993).

The Second Circuit has held that "the most important *Cammer* factor is the 'cause and effect' factor — evidence that unexpected corporate events or releases caused an immediate response in the price of a security. This is 'the essence of an efficient market and the foundation for the fraud on the market theory.' *In re Fed. Home Loan Mortgage Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 178 (S.D.N.Y. 2012), *quoting Teamsters Local 445 Frgt. Div. Pension Fund*, 546 F.3d at 207 (2d Cir. 2008), *quoting Cammer v. Bloom*, 711 F. Supp. at 1287. The *Teamsters* court stated:

> Without the demonstration of such a causal relationship, it is difficult to presume that the market will integrate the release of material information about a security into its price. An event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered prima facie evidence of the existence of such a causal relationship.

*Teamsters Local 445 Frgt. Div. Pension Fund*, 546 F.3d at 207-208.

Finally, "[a]t the class certification stage, the securities' trading record may create certain rebuttable legal presumptions about market efficiency. If, for example, a security is listed on the NYSE, AMEX, NASDAQ, or a similar national market, the market for that security is presumed to be efficient." *Teamsters Local 445 Frgt Div. Pension Fund v. Bombardier, Inc.*, 05 CIV. 1898 (SAS), 2006 WL 2161887 (S.D.N.Y. 2006) *aff'd,* 546 F.3d 196 (2d Cir. 2008) (*quoted in Billhofer v. Flamel Technologies, S.A.*, 281 F.R.D. 150, 159 (S.D.N.Y. 2012)).

Using the above standards as a benchmark, there is compelling evidence that the market for China North securities during the Class Period was efficient, including the following:

***Volume vs. Float***: The weekly average volume of China North stock during the Class Period was 13.48% of its weekly average float. During the Class Period the average weekly volume for China North stock was 1,743,866 and the average weekly float was 12,936,887.

***Average Daily Volume***: The average daily volume for China North stock during the Class Period was 361,318.

***Market Makers***: China North traded on the NYSE Amex, which is primarily an order-driven market with a floor-based trading system until delisted after the close of the Class Period. As opposed to multiple market makers, who together serve to provide liquidity for quote-driven stocks on the NASDAQ and over-the-counter systems, on the NYSE Amex, a single Designated Market Maker is assigned to each security to provide liquidity and facilitate a market. Thus, the number of market makers is not relevant to a NYSE Amex traded stock. *See Vinh Nguyen v. Radient Pharm. Corp.,* 287 F.R.D. 563, 573 (C.D. Cal. 2012)(so holding);

***Ability to File a Form S-3***: For a majority of the Class Period, China North met the eligibility requirements for filing a Form S-3 during the Class Period.

***Cause-and-Effect Relationship***: Immediate price reactions to the Company's public disclosures also support the conclusion that China North's stock traded on an efficient market. *See Winstar, supra, Id.*; *In re Xcelera.com Sec. Litig.,* 430 F.3d 503, 512-514 (1st Cir. 2005) ; *In re Accredo Health, Inc. Sec. Litig.,* 03-2216 DP, 2006 WL 1716910, at *5 (W.D. Tenn. Apr. 19, 2006); *Castillo v. Envoy Corp.,* 206 F.R.D. 464, 470 (M.D. Tenn. 2002). Here, China North stock reacted immediately and significantly to each of the alleged corrective disclosures. The stock fell more than 7% on February 24, 2010 following the February 23, 2010 initial disclosure of the need to restate (¶ 5, 87); nearly 18% on April 15, 16 and 19, 2010 following the disclosures on April 15 and 16 that the Company would not be filing its 2009 10-K on time because it would be unable to prepare and review all necessary information and disclosures without incurring unreasonable effort and expense (¶¶ 8, 91, 93); and more than 19% on September 9, 2010 when trading resumed after a wide variety of revelations, during the period when trading on the stock was halted, of prior misconduct (¶¶ 4, 106). Each of these stock drops was grossly out of proportion with the overall performance of the market on those days, as the S&P 500 index actually rose .97% on February 24, fell only 1.08% on April 15 through 19, and rose .48% on September 9.

Finally, because China North's common stock trades on an efficient market, so too do its options. As explained in *Deutschman v. Beneficial Corp.*, 841 F.2d 502, 504 (3d Cir. 1988):

Put and call options have been a feature of the national financial markets since 1790. Under these contracts a seller agrees to sell or a purchaser agrees to buy a security at a fixed price on or before a fixed date in the future. Such contracts

permit investors to hedge against future movements in the market price of securities … The option contract gives its owner the right to buy (call) or sell (put) a fixed number of shares of a specified underlying stock at a given price (the striking price) on or before the expiration date of the contract.  For this option a premium is paid, and the contract is worth more or less than the premium depending upon the direction of the market price of the underlying stock relative to the striking price. The market price for options is directly responsive, therefore, to changes in the market price of the underlying stock, and to information affecting that price. *See generally,* Rubenstein, An Economic Evaluation of Organized Option Markets, 2 J. of Comp.Corp.Law and Sec.Reg. 49 (1979).

*See also In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, MLD 1658 SRC, 2013 WL 396117, at *12 (D.N.J. Jan. 30, 2013)(quoting *Deutschman*);  *In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1329 (N.D. Ga. 2007)("a put options seller, upon proof of market efficiency in the underlying stock, is generally entitled to a rebuttable presumption of reliance."); *In re Enron Corp. Sec., Derivative & ERISA Litig.,* 529 F. Supp. 2d 644, 754 (S.D. Tex. 2006)(quoting *Deutschman*).

### 2.    A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of the Controversy

"Rule 23(b)(3) requires that a class action be superior to other methods of handling litigation." *Dirks v. Clayton Brokerage Co. of St. Louis Inc.*, 105 F.R.D. 125, 136 (D. Minn. 1985). "Together with predominance, the superiority requirement 'ensures that the class will be certified only when it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007).  Class treatment is often deemed superior in "negative value" cases, in which each individual class member's interest in the litigation is less than the anticipated cost of litigating individually.  *Menkes*, 270 F.R.D at 100. Courts have universally recognized the superiority of class actions in cases alleging securities fraud.  *See* p. 1, *supra*. The following factors are relevant to the superiority assessment:

22

> A) the class members' interests in individually controlling the prosecution . . . of separate actions; B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; C) the desirability…of concentrating the litigation of the claims in the particular forum; and D) the likely difficulties to be encountered in managing a class action.

Fed. R. Civ. P. 23(b)(3). These factors weigh in favor of class certification in this case.

The members of the proposed Class have little interest in pursuing individual actions. The costs and expenses of such actions, when weighed against the individual recoveries obtainable, would be prohibitive. *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 304 (S.D.N.Y. 2003) (finding superiority requirement met when "[f]ew individuals could even contemplate proceeding with this litigation in any context other than through their participation in a class action, given the expense and burden that such litigation would entail," particularly when many of the putative plaintiffs have suffered economic loss of *de minimus* value); *In re Vivendi Universal, S.A.*, 242 F.R.D. 76, 92 (S.D.N.Y. 2007). A class action is not only an essential mechanism for investors to redress the injuries they suffered because of defendants' misconduct, it will also facilitate the vindication of the statutory objective of a fair, orderly, trustworthy, and reliable securities market. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 n.4 (2007)("Nothing in the [PSLRA], we have previously noted, casts doubt on the conclusion 'that private securities litigation is an indispensable tool with which defrauded investors can recover their losses' — a matter crucial to the integrity of domestic capital markets.") (citations omitted).

Moreover, there are hundreds, if not thousands, of Class members. "Litigating each case separately would be wasteful, and result in delay and an inefficient expenditure of judicial resources." *In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 579 (S.D.N.Y. 2008). It would also "risk disparate results among those seeking redress." *Id.* Finally, there is no

reason to expect any difficulties in managing this case as a class action.  Indeed, class actions of

this size and complexity are common.

## II.    POMERANTZ SATISFIES THE RULE 23(g) PREREQUISITES FOR APPOINTMENT AS CLASS COUNSEL

Rule 23(g)(1)(A) sets forth the factors a court must consider in appointing Class Counsel,

including:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class.

Under these criteria, the Pomerantz firm is eminently qualified.

The Pomerantz firm was established in 1940 by the late Abraham L. Pomerantz, the

recognized "Dean of the Class Action Bar" and a "pioneer in the class action/derivative field."[10]

The firm has litigated securities fraud cases under federal and state laws for nearly seventy five

years, on behalf of institutional and individual investors in both class and individual actions, and

has set important precedents.   Courts have routinely acknowledged Pomerantz's securities

litigation strengths.  For example, in *Stengle v. American Italian Pasta Co.*, the court  appointed

Pomerantz as Lead Counsel, remarking that the firm: "has significant experience (and has been

extremely effective) litigating securities class actions, employs several highly qualified attorneys,

and possesses ample resources to effectively manage the class litigation and protect the class's

interests."   No. 05-cv-725, 2005 U.S. Dist. LEXIS 43816, at *27 (W.D. Mo. Dec. 19, 2005).

Institutional Shareholder Services ranked Pomerantz third in the country in 2005 for the highest

average settlement amount achieved on behalf of clients.[11]   On October 3, 2011, The National

---

[10] N.Y.L.J. (Aug. 1, 1983).  *See also* Robert J. Cole, *Class Action Dean*, NAT'L L.J. (Sept. 25, 1978).

[11] SCAS 50 for 2005.

Law Journal ("NLJ") named Pomerantz to the Plaintiffs' Hot List for 2011. The Firm was recognized for its work representing plaintiffs in securities litigation and ERISA-related actions.[12]

Here, Lead Counsel has effectively used its experience to vigorously pursue the interests of all Class members, including filing a factually detailed Complaint and successfully appealing this Court's granting of Defendants' motion to dismiss before the Second Circuit.

## **CONCLUSION**

For the reasons stated herein, Lead Plaintiff respectfully requests that the Court issue an Order: (1) certifying this action pursuant to Rule 23 as a class action and certifying the Class defined herein; (2) appointing the Lead Plaintiff as the Class Representative; (3) appointing Lead Counsel as Class Counsel; and (4) granting such other and further relief as the Court may deem just and proper.

Dated: April 14, 2014

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*_____

Marc I. Gross
Jeremy A. Lieberman
Tamar A. Weinrib
600 Third Avenue
New York, N.Y. 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665

---

[12] "The Plaintiffs' Hot List." National Law Journal (Oct. 3, 2011).

**POMERANTZ LLP**
Patrick V. Dahlstrom
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184

*Lead Counsel for the Class*

**WEISS & LURIE**
Joseph H. Weiss
James E. Tullman
Mark D. Smilow
551 Fifth Avenue, Suite 1600
New York, New York 10176
Telephone: (212) 682-3025
Facsimile: (212) 682-3010

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
Phillip Kim
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827

*Counsel for Plaintiff*