UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re China North East Petroleum Holdings Limited Securities Litigation** | **No. 10-cv-04577 KBF** |
| | SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT |
| **THIS DOCUMENT RELATES TO: ALL ACTIONS** | **JURY TRIAL DEMANDED** |

Lead Plaintiff Acticon A.G. (the "Lead Plaintiff"), individually and on behalf of all other persons similarly situated, by its undersigned attorneys, for its Second Consolidated Amended Class Action Complaint against defendants, alleges as follows, based on, *inter alia*, the investigation conducted by and through its attorneys, which included: a review of the defendants' public statements and documents; conference calls and announcements made by defendants; Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding China North East Petroleum Holdings Limited ("China North" or the "Company"); securities analysts' reports and advisories about the Company; filings in *SEC v. China Northeast Petroleum Holdings Ltd., et al.*, 12 Civ. 8696 (S.D.N.Y.) (Buchwald, J.); and information readily obtainable on the Internet.

## NATURE OF THE ACTION

1.  This is a securities fraud class action on behalf of all persons who purchased or acquired China North securities during the period from May 15, 2008 through and including May 26, 2010 (the "Class Period"). This class action is brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a); and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

2.  China North, through its subsidiaries, engages in the exploration and production of crude oil in the People's Republic of China. Its subsidiaries have entered into twenty year lease

agreements with PetroChina Company ("PetroChina") for extraction of oil in four different oilfields.  Such oil is then sold to PetroChina for use in the Chinese marketplace.

3.   China North is a closely knit organization.  One third of its outstanding stock is held by Defendant Wang Hung Jun ("Wang"), the Company's CEO who had almost unfettered control over the Company until his forced departure upon disclosure of the fraud alleged herein.  Indicative of his control, both Wang's mother, Guizhi Ju ("Ju"), and brother-in law served as Directors of the Company.  Thus, during the Class Period, over half of the Company's five Directors were related to Wang.  Moreover, Yang Zhang ("Zhang"), who served as Chief Financial Officer of the Company prior to his resignation, was merely 27 years old during the Class Period — hardly a veteran executive that could provide effective counterweight to the domineering presence of Wang.

4.   Throughout the Class Period, Defendants consistently touted China North's "healthy quarterly revenue, EBITDA and profit growth."  However, fueled by the incestuous nature of the Company's executives and directors, this illusion of "growth" was built on a fragile house of cards. In particular, the Company:

   a.   Inflated the amount of its proved oil reserves by 25%, and the net carrying value of its oil fields by over 75%.

   b.   Failed to account for substantial losses associated with warrants issued to an investor in the Company, as required under GAAP.

   c.   As a result of the above, overstated reported earnings by over $36 million;

   d.   Inflated 2008 profits by nearly 100%, and reported net income by over $9 million for the first three quarters of 2009, when in fact the Company had sustained a loss of more than $16 million;

e.  Misrepresented the state of the Company's internal controls. Among other things, China North's CEO, Defendant Wang, and his mother, Defendant Ju, looted approximately $59 million from the Company's bank accounts by engaging in numerous undisclosed and fraudulent related party transactions, including 176 fraudulent transfers committed by Wang and Ju in 2009 alone.

5.  Investors first glimpsed the fraudulent nature of China North's self-portrait on February 23, 2010, when the Company announced that its financial statements for year end December 31, 2008 and the first three quarters of 2009 required restatement and should no longer be relied upon.  China North's stock fell $0.69, more than 7%, on unusually heavy volume.

6.  The February 23 announcement triggered a bizarre series of events at the Company, which included a staggering restatement, revelation of illicit bank transfers from the Company to the bank accounts of Wang and Ju, and a dizzying number of resignations and replacements at the executive and director level.

7.  On April 20, 2010, China North filed an 8-K with estimates of its anticipated restatement.  The Company estimated that previously reported net income for 2008 of $19.5 million would be slashed to $10.5 million, an overstatement of nearly 100%.  Even more devastating, net income for the nine months ended September 30, 2009 was reduced from a profit of $10.75 million to a loss of $16.5 million, a $27.2 million swing.

8.  Equally unsettling were revelations of illicit cash transfers from the Company's corporate coffers to the personal bank accounts of Wang and Ju.  On April 16, 2010, the Company announced that it had "identified potential control deficiencies over financial reporting in connection with certain expenditures related to business development activities," raising the

specter of possible violations of the FCPA.  In response, the Company's stock slid $1.02, more than 11% in the next two trading sessions, on unusually high trading volume.

9.   On May 27, 2010, the Company made a further disclosure regarding the illicit bank transfers, acknowledging that a forensic audit conducted by John Lees & Associates ("JLA"), had preliminarily concluded that in 2009 "a very large number and amount of unauthorized," cash transfers occurred between the bank accounts of the Company and its subsidiaries and the personal bank accounts of Wang and Ju.  The forensic audit was headed by the Company's Audit Committee Chairman, Robert C. Bruce ("Bruce").

10.   In light of the growing evidence of corruption at the very top of the Company's management, Wang was forced to resign as CEO and Chairman of the Board, and placed on administrative leave pending completion of the forensic audit.  Additionally, Defendant Ju also resigned from the Board, as did Zhang, the Company's Chief Financial Officer.  Other officers and directors of the Company also soon jumped ship, undoubtedly due to the stench of fraud at the Company.

11.   In response to the forensic investigation, as well as the Company's failure to restate its financials, the NYSE AMEX halted trading on China North's stock on May 25, 2010.  The Company's stock closed at $5.50 prior to the halt.

12.   JLA issued its final report on July 10, 2010.  The JLA report identified major internal control deficiencies, as well as possible violations of GAAP (in addition to those already identified in connection with the restatement), and the FCPA.  Bruce, who commissioned the JLA report, in a letter dated July 22, 2010, urged the Board to conduct a further investigation to issues raised in JLA's report regarding, *inter alia*, whether the Company made payments to government officials in violation of the FCPA, and whether the Company had committed other

violations of GAAP in addition to those issues identified in the pending restatement (Attached as Exhibit A hereto).

13.     On August 5, 2010, Edward Rule, acting Chairman of China North's Board, rejected Bruce's demand, prompting Bruce to resign.

14.     The Company's May 27, 2010 8-K, Bruce's July 22, 2010 letter to the Board, and his subsequent resignation, were not absorbed by the market until September 9, 2010, when the Company's stock finally resumed trading after a three month hiatus.  That day, in reaction to these events, the Company's, stock price plummeted from $5.50 to $4.42, on unusually heavy trading volume.

15.     Thus, from the time of the initial revelations of fraud in February to the resumption of trading in September following filing of the restated financials, China North's shares fell 47% from $9.37 to $4.42.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

18.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  China North's executive offices are located in the Southern District of New York and its common stock is traded on the NYSE AMEX (American Stock Exchange) which is located in the Southern District of New York.

19.    In connection with the challenged conduct, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### Plaintiff

20.    Lead Plaintiff Acticon AG, as set forth in its previously filed certification, purchased China North securities during the Class Period on the AMEX and was damaged when the disclosures of the Company's accounting improprieties caused the price of China North's shares to decline.

### Defendants

21.    Defendant China North is a Nevada Corporation with its principal executive offices located at 445 Park Avenue, 10th Floor, New York, NY 10022.   The Company, through its operating subsidiaries, engages in the exploration and production of crude oil in the People's Republic of China.   The aggregate number of shares of China North securities outstanding as of November 12, 2009 was approximately 25.8 million.   The Company is actively traded on the NYSE AMEX under the ticker symbol "NEP."

22.    Defendant Wang served as China North's Chairman and Chief Executive Officer ("CEO") during the Class Period until May 23, 2010, and now serves as a Director of the Company.   On May 23, 2010, Wang was placed on administrative leave as the CEO of the Company and was removed as Chairman, pending the outcome of the Audit Committee investigation.   He still remains on administrative leave, despite the fact that JLA concluded its

forensic audit in July, 2010.  Defendant Wang was a signatory to China North's 2008 10-K dated March 30, 2009 in addition to all its quarterly reports.

23.    Defendant Ju Guizhi ("Ju"), the mother of Defendant Wang, served as a Director of the Company from November 20, 2009 until May 23, 2010.  Ju serves as a General Manager and Director of Songyuan Yu Qiao Oil & Gas Development Co., Ltd., a wholly owned subsidiary of the Company.  As a result of the JLA report, Ju resigned from the Company on May 23, 2010.

24.    The defendants referenced above in ¶¶ 22-23 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

25.    China North is engaged in the exploration and production of crude oil in Northern China. As of December 31, 2008, the Company operated 247 producing wells located in four oilfields in the region.  The Company, through two of its subsidiaries, Songyuan Yu Qiao Oil & Gas Development Ltd. Corp. and Longde Oil and Gas Development Co. Ltd., sells the crude oil production to PetroChina for use in the China marketplace.

## THE FRAUDULENT SCHEME

### Undisclosed Illicit Money Transfers, The JLA Report, and Bruce's Resignation

26.    While consistently certifying the strength of the Company's internal controls, Wang, along with his mother, pillaged China North's coffers for "business development" purposes that, as indicated by Bruce's resignation letter, the Company suspected may have involved illicit payments to Chinese officials in violation of the FCPA.

27.    During 2009 alone, there were at least 176 undisclosed, related-party transactions recorded in China North's accounting records. The related-party activity was comprised of approximately $28 million of transactions directly or indirectly from the Company to Defendants

Wang or Ju; approximately $11 million purportedly loaned to China North or paid to third parties on behalf of China North by Wang or Ju; and $20 million of post-year-end adjustments and year-end consolidations that purportedly reduced the debt owed by Wang and Ju to China. Together, these transactions totaled approximately $59 million of related-party activity during 2009. Neither the magnitude nor the volume of these related-party transactions has been fully disclosed to the investing public.

28. In late 2009, China North made two public stock offerings. In connection with these offerings, China North publicly stated to investors in a registration statement signed by Defendant Wang that the offering proceeds would be used "to fund its future business expansion plan, and for general working capital purposes." China North and Defendant Wang subsequently repeated this representation in additional public statements in connection with the two offerings. China North and Defendant Wang did not disclose to investors the past pattern of related-party transactions or their intention to divert offering proceeds for improper purposes. China North's Registrations Statement filed on Form S-3 incorporated by reference China North's Annual Report for the year ended December 31, 2008 on Form 10-K and China North's Quarterly Report for the quarter ended March 31, 2009 on Form 10-Q. Each form falsely reported a consolidated cash balance of $13,239,213, which was intentionally overstated by $1 million.

29. In those two offerings, China North raised approximately $31.9 million in the U.S. capital markets in September and December 2009. The offering proceeds were initially deposited into China North's U.S. bank account (the "U.S. Bank Account"). Consistent with a preexisting pattern of engaging in undisclosed, related-party transactions, funds were then diverted to corporate insiders and their family members in a manner that was neither disclosed to investors

nor consistent with China North's representations to investors concerning the intended and permissible uses of the offering proceeds.

30. After offering proceeds were deposited into the U.S. Bank Account, Defendants made, or caused to be made, a number of transfers to company insiders or their family members, including without limitation:

• Defendant Wang's wife, Jishuang Sun ("Sun"), received $300,000 from CNEP's U.S. Bank Account and used the funds to purchase a home in California;

• Defendant Ju received $5.85 million in a series of transfers that originated from CNEP's U.S. Bank Account.

31. Prior to the deposit of the offering proceeds, there were insufficient funds in the U.S. Bank Account to cover any of these transfers. China North's Board of Directors was not apprised of and did not approve these transfers of funds; none of the transfers had any documented business purpose; none were consistent with the China North's representations to the investing public concerning the stated uses of the offering proceeds; and none of the transfers were disclosed to China North investors. China North and others also knowingly provided false information and documents to auditors, including bank statements that were falsified to show an additional $1 million of nonexistent funds in a corporate bank account.

32. In April 2010, Bruce discovered a line item in the company's draft 2009 financial statements reflecting that $3.89 million was allegedly due to China North from a shareholder. Prior to April 2010, neither the Board of Directors nor the Audit Committee had been apprised of any such debt or the underlying transactions with a shareholder giving rise to such debt.  After receiving varying conflicting explanations for the debt, the Audit Committee requested that China North and its Board of Directors retain a Hong Kong accounting firm, to review the $3.89

million debt and any other related-party transactions that had occurred in 2009.  They engaged John Lees & Associates ("JLA").

33. On July 10, 2010, JLA issued a report to China North's Board of Directors identifying at least 176 undisclosed, related-party transactions between China North and Defendants Wang or Ju in 2009 (the "JLA Report").  The Company did not disclose the JLA Report at the time.

34. During the investigation of Defendant Ju's alleged $3.89 million debt, China North's then-CFO admitted that transfers between the company and Defendants Ju or Wang occurred more regularly than he had previously represented to the Audit Committee.

35. As a result of the investigation, the Board of Directors learned that the $3.89 million debt had not been a "one-off transfer" but rather the result of a subset of the 176 undisclosed, related-party transactions. The Board of Directors further learned that it was not possible to identify the transactions allegedly underlying the $3.89 million because of "the significant number and diverse nature of transactions" with Defendant Ju. Defendant Ju claimed that transactions occurred through her personal accounts to avoid certain corporate taxes and, thereby, obtain lower prices from vendors. JLA, however, found that "[n]o supporting documentation is available to verify these representations . . . ."

36. The 176 related-party transactions detailed in the July 2010 Report totaled approximately $59 million, which included the $3.89 million debt owed by Defendant Ju to China North. The $59 million total included approximately $28 million of transactions directly or indirectly from China North to Defendants Wang or Ju, plus approximately $11 million that Defendants Wang or Ju allegedly loaned to China North or paid to third parties on behalf of the Company. A balance of approximately $20 million remained due from Defendants Wang or Ju to

China North as of December 31, 2009, but that debt was purportedly eliminated through a series of unusual and largely uncorroborated post-year-end adjustments and consolidating journal entries, including a purported $4.6 million capital infusion by Defendant Wang.

37. The $28 million worth of transactions involving Defendants Ju and Wang that occurred during 2009 included cash loans from China North to Defendants Ju and Wang of at least $17.2 million and $3.8 million, respectively. These "loans" were not documented and did not have any written repayment terms.

38. In terms of the magnitude of these related-party transactions with Defendants Ju and Wang, $28 million is approximately 94% of the $29.9 million of net proceeds that China North received from the 2009 public offerings; almost twice the approximately $15.9 million in cash provided by operations in 2009; and 43% of China North's reported annual revenue of approximately $64.7 million for 2009.

39. The Audit Committee Charter required all related-party transactions to be reviewed and approved by the Audit Committee. Yet, neither the Board of Directors nor the Audit Committee was apprised of, much less approved, the 176 related-party transactions detailed in the JLA Report. Moreover, neither the volume nor the magnitude of these related-party transactions was fully disclosed to the investing public.

40.  As disclosed in an 8-K filed by the Company on August 16,  2010, on July 22, 2010, in response to the report, Bruce wrote a letter to his fellow Directors urging them to "take additional steps to ***investigate questions raised by the JLA report***" regarding: 1) whether the Company's previously filed financial reports and associated financial statements were materially correct under GAAP (aside from those issues already identified  in the restatement); and 2) whether the Company made payments to government officials in violation of the FCPA.

Indicative of his concern that securities fraud violations had occurred, Bruce further recommended that the Company initiate a "self reporting process**" with the Enforcement Division of the SEC in order to:**

> **"establish a record with the SEC of the Company's commitment to investigate and remediate historic issues, which the SEC would certainly take into account when considering sanctions for potential regulatory or legal violations that the Company may ultimately be found to have committed."**

(emphasis added).

41.   In the letter, Bruce stated that he was not "implying" that (i) FCPA violations had taken place, (ii) Company funds were "misused", or (iii) that the prior financials were misleading in ways other than indicated by the previously announced restatement.  However, he noted "the very large number and amount of unauthorized transfers of Company funds" to Wang and Ju's personal bank accounts, adding  that:

> **I believe that the information and findings contained in the JLA Report unambiguously indicates that neither the Company nor the directors can state with confidence that: a) the Company is free of FCPA violations, b) that Company funds have not been misused in periods prior to January 1, 2009, or c) that the Company's financial statements and prior SEC filings are free of material misstatements.**  (emphasis added).

42.   On August 5, 2010, acting Chairman of the Board, Edward Rule, responded to Bruce's letter, categorically rejecting his recommendation for further investigation, on the basis that such an investigation could result in China North's delisting, which "could destroy shareholder value," and was therefore "at odds with the prudent discharge of duties to the shareholders."   Rather than be complicit in this outright cover-up, on August 8, 2010, Bruce resigned from the Company, citing:

> substantial disagreement between me and [the Board] regarding the appropriate action of the Company with respect to further investigation into the Company's prior period SEC filings, internal controls and cash activity.

43.     Moreover, Bruce reiterated his belief that the Company should conduct a further investigation to determine whether "its previously filed financial statements, the pending restatements and related internal controls are in compliance with applicable securities laws and regulations." Exhibit B.

44.     On September 7, 2010, the Company finally issued a press release (and filed a Form 8-K) regarding the JLA Report.  Despite Bruce's thunderous departure, the Company sought to whitewash the report's findings, insisting the JLA report found that "there was no evidence funds were misappropriated, stolen or otherwise misused by anyone."  In so doing, the Company ignored the concerns raised by Bruce that without further investigation, there could be no assurance the Company had not violated the FCPA in the past or that its financial statements were not in violation of GAAP.

45.     Indicative of his lack of credibility, and the cloud that continues to hover over the integrity of the Company's Audit Committee investigation, Defendant Wang remains on administrative leave, despite the fact that JLA concluded its forensic audit in July, 2010.

## CHINA NORTH'S ACCOUNTING MANIPULATIONS

46.     Wang's unfettered control of China North was not only demonstrated by his easy access to — and pilfering of — the Company's coffers.  It was also demonstrated by brazen accounting manipulations which had the effect of overstating the Company's net income and reporting profits, when, in fact, the Company had incurred substantial losses.

47.     Such accounting manipulations took two primary forms:  1) a gross inflation of the carrying value of the Company's oil properties; and 2) failure to recognize costs associated with warrants issued in connection with a sale of debentures to a third party.

**Inflation of Oil Property Reserves and Valuations**

48.   China North, through its subsidiaries, leases four oilfields from Petrochina, from which it extracts oil and sells to Petrochina for use in the Chinese marketplace.  Pursuant to SEC regulations, a Company is required to reduce from income any reduction in value to its properties that occurred in a given reporting period.  During the Class Period, China North employed the full cost method of accounting for its oil properties, pursuant to SEC Regulation S-X (17 C.F.R. § 210.4-10(c)(4)).  Under full cost accounting rules, a "ceiling test" must be performed each year on oil properties.   The ceiling test provides that capitalized costs less related accumulated depletion and deferred income taxes for each cost center cannot exceed the sum of:

(1) the present value of estimated future net revenues computed by applying current prices of oil and gas reserves (with consideration of price changes only to the extent provided by contractual arrangements) to estimated future production of proved oil reserves as of the date of the latest balance sheet, less estimated future expenditures to be incurred in developing and producing the proved reserves using a discount factor of ten percent and assuming the continuation of existing economic conditions; plus

(2) the cost of properties not being amortized, if any; plus

(3)  the lower of cost or estimated fair value of unproven properties included in the costs being amortized; less

(4) income tax effects related to differences between the book and tax basis of the properties.

49.   Put simply, under the full cost accounting method, if anticipated net revenues from a given property are less than the property's capitalized cost and expenses, an impairment must be immediately recognized.

50.   China North's ceiling tests were performed by Ralph E. Davis Associates, Inc. ("Davis") (a consulting firm based in Houston Texas, which provides reservoir engineering, geological, technical and financial services to domestic and international energy companies) and

incorporated into the Company's financial reports.  In its April 20, 8-K, the Company initially attributed the miscalculation of the fair market value of its oilfields to the utilization of mistaken (i) projections of lease and operating expenses; (ii) tax expense assumptions; and (iii) discounted cash flows.

51.    It was not until September 1, 2010, in connection with filing its final restated results for 2008 and 2009 that the Company finally attributed the miscalculations solely to a failure to account for "a significant decline in the price of oil" in the fourth quarter of 2008.  How China North could have missed the sharp declines in the price of oil during the height of the recession in the end of '08 is unfathomable.  Indeed, oil declined from $140 per barrel as of June 2008 to under $40 per barrel as of December 31, 2008.  Consequently, as oil prices plunged during the recession of 2008, China North was required to take a severe impairment to its oil properties, which it failed to do in an effort to prop up its reported net income.

52.    However, the Company never publicly linked the miscalculations to another obvious factor, the overstatement of proved reserves by 25% as of year end 2008.  Whereas it was initially reported that proved reserves were 5.5 million bbls, there were, in fact, only 4.4 million bbls, as indicated in the Company's 10-K/A.

53.    As a result of these reckless calculations, the net carrying value of the Company's oil properties was overstated by 75% during the Class Period.  For example, for the fiscal year ended 2008, the Company reported net carrying value for its oil properties at $70 million, which was ultimately restated to $54.3 million.  For the period ending March 31, 2009, the Company reported a net carrying value of $67.67 million, which was restated to $37.5 million.

54.    In other words, within the three month period from December 31, 2008 to March 31, 2009, the Company's valuation of its oil fields were restated from $70 million to $37.5

million.  Since the restated value of the properties was well below their acquisition costs, the Company recognized a total impairment of $29.45 million for the two periods, $15.6 million of which was allocated for the fiscal year of 2008, and the remaining $13.834 million for the first three quarters of 2009.

55.   However, most, if not all of the impairment and losses, should have been recognized as of year-end 2008, rather than being essentially split between the last quarter of 2008 and the first quarter of 2009.  This is due to the fact that the price of oil, which was the key factor that triggered the impairment, actually rose from $44.60 per barrel to $49.66 between the two periods.  Thus, although the Company attributed its impairment for the first quarter of 2009 to "continued decline in prices for the first quarter of 2009," in fact, no such decline occurred, indicating that the full impairment should have been recognized in the quarter ending December 31, 2008.

56.   Nonetheless, approximately 45% of the total impairment of $29.45 million for the two quarters was allocated to the latter one.  Such allocation lacked any reasonable basis.

**Improper Accounting for Warrants**

57.   On March 3, 2008, the Company announced that it had entered into a Purchase Agreement whereby Lotusbox Investments, Limited ("Lotusbox") had agreed to pay $15 million cash in exchange for an 8% Secured Debenture due 2012 (the "Debenture") and five year warrants exercisable for up to (i) 1,200,000 shares of the Company's common stock at an initial exercise price equal to $0.01 per share ("Class A Warrants"), (ii) 1,500,000 shares of the Company's common stock at an initial exercise price equal to $3.20 per share ("Class B Warrants") and (iii) 2,100,000 shares of the Company's common stock at an initial exercise price

equal to $3.45, with all warrant exercise prices being subject to certain adjustments (the "Warrants").

58.   Authoritative GAAP guidance for accounting of the Warrants was provided by EITF 00-19, *Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's own Stock*. To the extent that the securities were debt instruments, (and not equity) GAAP required the Company to account for fluctuations in their value at the end of each reporting period.  Thus, if China North's share price increased in a given reporting period, it was required to record a charge on its income statement to reflect the Company's greater obligations to Lotusbox as a result of the increased share price.

59.   China North itself stated that it classified the Warrants as "debt" in its public filings. This was consistent with Paragraph 8 of EITF 00-19 which provides that a contract should be deemed a liability if:

    a)    the contract requires net-cash settlement (including a requirement to net cash settle the contract if an event occurs and if that event is outside the control of the company); or

    b)    the contract gives the counterparty a choice of net-cash settlement or settlement in shares (physical settlement or net-share settlement).

60.   Both of these circumstances were present here, requiring the classification of the Lotusbox warrants as liabilities.  First, Section 2(c) of the Purchase Agreement provided that if the Company did not have a valid Registration Statement within 180 days from the closing of the Purchase Agreement, Lotusbox had the option to force the Company to fulfill its obligations by transferring a requisite number of shares as opposed to exercising the warrants, thus fulfilling the second prong of the liability categorization.   Moreover, Section 2(d)(iv) of the Purchase Agreement required the Company to pay Lotusbox in cash for any loss incurred if the requisite

share certificates under 2(c) were unavailable, thereby triggering the first prong of paragraph 8's liability categorization (Attached as Exhibit C).

61.   Throughout the Class Period, the Company itself acknowledged that the Lotusbox warrants were liability contracts.  Thus, it made the representation in each of its 10-Q's and 10-K's filed during the Class Period that "the Company *accounts* for [the Lotusbox warrants] as liability instruments in accordance with paragraph 8 of EITF 00-19" (emphasis supplied).

62.   As it turned out, this was an outright fabrication.  In the Company's April 20 8-K, it acknowledged that the Lotusbox warrants were, in fact, accounted for by the Company as equity instruments, rather than liabilities.  As a result of the improper accounting, the Company failed to recognize a loss on the warrants as the Company's share price steadily rose during the Class Period from $2.15 per share on March 3, 2008 — the first trading date after the execution of the Purchase Agreement — and the Company's Class Period high of $11.35 per share on January 26, 2010.

63.   The impact of this blatant manipulation was drastic.  As a result of the improper accounting for the Lotusbox warrants, the Company's net income was inflated by $ $9,805,886 for the first three fiscal quarters of 2009.

## THE FALSE AND MISLEADING STATEMENTS

64.   As detailed below, throughout the Class Period, Defendants issued statements that were materially false and misleading because:

> (a)   The net carrying value of the Company's oil properties were materially overstated;

     (b)    The decline of the value of such properties below their capitalized costs was not recorded as an expense in the period incurred, thereby inflating the Company's reported net income;

     (c)    In addition, as of year-end 2008, the size of the Company's proven oil reserves was materially overstated;

     (d)    Losses associated with warrants issued to Lotusbox were not properly recognized, thereby inflating net income for 2009;

     (e)    Statements by Defendants regarding the adequacy of  internal controls failed to account for rampant pilfering of the Company's cash coffers by its CEO and related Director;

     (f)    Statements by Defendants regarding the adequacy of internal controls failed to disclose that the Company's internal controls were insufficient to insure that the Company did not violate the FCPA.

65.   The impact of improper accounting and inflation of profits is reflected in the following chart:

All Dollar Values are in Millions

| | 2008 Reported | 2008 Restated | Difference | Nine Months Ended 9/30/09 Reported | Nine Months Ended 9/30/09 Restated | Difference | Total Difference |
|---|---|---|---|---|---|---|---|
| Impairment or Depreciation of Oil properties | $0 | $16.251 | $16.251 | $0 | $13.833 | $13.833 | $29.455 |
| Change in Fair Value of Warrants | $0 | $4.464 | $4.464 | $0 | ($9.805) | ($9.805) | ($14.68) |
| Net Income | $19.58 | $10.52 | ($9.061) | $9.254 | ($16.982) | ($27.1) | ($36.16) |
| Earnings Per Share | .99 | .53 | (.46) | 0.43 | (.81) | (1.24) | (1.70) |

**First Quarter 2008**

66.    On May 15, 2008, the Company filed its Form 10-Q with the SEC for the first quarter ended March 31, 2008 ("1Q08").  The Company reported proven oil reserves of 2.46 bbls; net carrying value of its oil properties of $42,616,236; revenues of $10.8 million (compared to $1.9 million 1Q07) and net income of $3.3 million, or $0.17 per diluted share (compared to $287,000/ $0.01 per diluted share 1Q07).

67.    The Company also reported that it had entered into the aforementioned Purchase Agreement with Lotusbox, and that it had accounted for the warrants "as liability instruments in accordance with paragraph 8 of EITF 00-19."  This representation was repeated in each of the subsequent Form 10-Qs and 10-K discussed below.

68.    The Form 10-Q contained certifications executed by Defendant Wang pursuant to the Sarbanes-Oxley Act of 2002 ("Sarbanes Oxley"), representing that the financial information contained therein was accurate, and that they had "designed such internal control over financial reporting to provide reasonable assurance regarding the reliability of financial reporting" (the Sarbanes-Oxley Certifications").

69.    The foregoing statements were materially misleading for the reasons set forth in Par. 52, *supra*.

**Second Quarter 2008**

70.    On August 14, 2008, the Company filed its Form 10-Q for the second quarter ended June 30, 2008 ("2Q08").  The Company reported proven oil reserves of 2.468 bbls; a net carrying value of its oil properties valued at $49,218,992; revenues of $14.2 million (compared to $4.1 million2Q07); net income of $3.8 million, or $0.19 per diluted share (compared to net income of $1.3 million, or $0.04 per diluted share for  2Q07).

71.    Defendant Wang executed Sarbanes-Oxley Certifications attesting to the accuracy of the financials and sufficiency of internal controls.

72.    The foregoing statements were materially misleading for the reasons set forth in Par. 52, *supra*.

**Third Quarter 2008**

73.    On November 14, 2008, the Company filed its Form 10-Q for the third quarter ended September 30, 2008 ("3Q08").  The Company reported proven oil reserves of 2.468 bbls; a net carrying value of its oil properties of $56,007,998; revenues of $19.1 million (compared to $5.8 million in the 3Q07) and net income of $4.9 million, or $0.24 per diluted share (compared to net income of $1.5 million, or $0.08 per diluted share in the 3Q07).

74.    In touting the Company's results and prospects, Defendant Wang attributed the Company's success to a "lower government oil surcharge" along with [keeping] our operating costs low and continue to implement strict cost controls in all key areas of operation." Defendant Wang signed the Sarbanes Oxley Certifications attesting to the accuracy of the financial results and the adequacy of internal financial controls.

**Year End 2008**

75.    On March 30, 2009, the Company filed its Form 10-K for the fourth quarter and year ended December 31, 2008.  Fourth quarter revenues totaled $14.5 million (compared to $7.7 million 4Q07); and net income totaled $7.6 million, or $0.37 per diluted share (compared to net income of $2.1 million, or $0.09 per diluted share in the 4Q07).  For the full year 2008, the Company reported revenues of $58.6 million (compared to $19.5 million 2007); and net income of $19.6 million, or $0.98 per diluted share (compared to net income of $5.1 million, $0.21 per diluted share in 2007).

76.   The Company's reported proven oil reserves for 4Q08 were 5.5 bbls; the net carrying value of the Company's oil fields were $70,193,852, a 25% increase from the prior quarter's valuation.

77.   This remarkable increase in the value of reserves was not due to acquisitions, but rather to a reassessment of the amount of proven reserves compared year end 2007.  As the Form 10-K noted:

> The Company's estimates of proven reserves are made using available geological and reservoir data as well as production performance data. These estimates, made by the Company's engineers, and independently verified by a US geological engineering firm, are reviewed annually and revised, either upward or downward, as warranted by additional data.  This independent annual audit was completed in the first quarter of 2009.  Prior to the completion of this audit, the Company had been using 2007 proven reserve estimates to calculate the depreciation of oil and gas properties for the first three quarters of 2008, which is standard accounting procedure and fully meets existing SEC regulations.   The recently completed annual audit concluded that the total proven oil reserve had increased significantly resulting in lower depreciation of oil and gas property and therefore requiring a one-time adjustment gain which incorporates the adjustment through the first three quarters of 2008 as well as for the fourth quarter period.

78.   The Form 10-K included "Management's Annual Report on Internal Control over Financial Reporting."   This Report acknowledged, *inter alia*, that it was management's responsibility to "provide reasonable assurance regarding prevention or timely detection of unauthorized acquisitions, use or disposition of the company's assets that could have a material effect on the financial statements", and that based on management's evaluation, "internal control over financial reporting was effective as of December 31, 2008."

79.   The 2008 Form 10-K was signed by Defendant Wang.   Its Sarbanes Oxley Certificates were executed by Defendant Wang.

80.   The foregoing statements were materially misleading for the reasons set forth in Par. 52, *supra*.

**First Quarter 2009**

81.   On May 15, 2009, the Company filed its Form 10-Q for the first quarter ended March 31, 2009 ("1Q09").  The Company reported proven reserves of 5.453 million bbls; net carrying value of its oil properties of $67,671,268; revenues of $8,899,223 (compared to $10,823,974 in the 1Q08), and net income of $2,271,353, (a decline from $3,375,015 in the 1Q08).

82.   Defendant Wang signed the Sarbanes Oxley Certification attesting to the accuracy of the financial results and sufficiency of internal controls.

83.   The foregoing statements were materially misleading for the reasons set forth in Par. 52, *supra*.

**Second Quarter 2009**

84.   On August 14, 2009, the Company filed its Form 10-Q for the second quarter ended June 30, 2009 ("2Q09").  The Company reported proven oil reserves of 5.43 million bbls; a net carrying value of its oil properties of $66.3 million; revenues of $11.3 million (compared to $14.2 million in the 2Q08); and net income of $2.8 million, or $0.13 per diluted share (compared to net income of $3.9 million, or $0.18 per diluted share in the 2Q08).

85.   The Sarbanes Oxley Certificates were signed by Defendant Wang attesting to the accuracy of the financial results and adequacy of internal controls.

86.   The foregoing statements were materially misleading for the reasons set forth in Par. 52, *supra*.

**Amended Form 10-Q for the Second Quarter 2009**

87.   On July 23, 2009, defendants, through the filing of Amendment 1 to the Company's 10-Q for the period ended March 31, 2009 (the "1Q09/A"), assured investors that the Company's

disclosure controls and procedures were operating effectively, and that there had been no changes to the Company's internal controls over financial reporting.  More specifically, in the 1Q09/A, signed by Wang, Defendants represented:

> Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, as of the end of the period covered by this Quarterly Report on Form 10-Q (the "Evaluation Date").  The purpose of this evaluation is to determine if, as of the Evaluation Date, our disclosure controls and procedures were operating effectively such that the information, required to be disclosed in our Securities and Exchange Commission ("SEC") reports (i) was recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and (ii) was accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

> Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of the Evaluation Date, our disclosure controls and procedures were operating effectively.

> *Changes in Internal Control over Financial Reporting*

> There have been no changes in our internal controls over financial reporting that occurred during the quarter ended March 31, 2009 that have materially affected, or are reasonably likely to materially affect our internal controls over financial reporting.

## Third Quarter 2009

88.    On November 16, 2009, China North filed its Form 10-Q for the third quarter ended September 30, 2009 ("3Q09").  The Company reported proven oil reserves of 5.4 million bbls; a net carrying value for its oil properties of $65.85 million; revenues of $14.4 million (compared to $19 million in the 3Q08); and net income of $4.1 million, or $0.17 per diluted share for the quarter, (compared to $5 million, or $0.24 per diluted share in the 3Q08).

89.    The Form 10-Q and Sarbanes Oxley Certifications were signed by Defendant Wang (the "3Q09").

90.   The foregoing statements were materially misleading for reasons set forth in Par. 52, *supra*.

91.   On November 24, 2009, the Company issued a press release announcing the appointment of Defendant Ju to the Company's Board of Directors, effectively immediately.

**The Truth Slowly Begins to Emerge**

**Withdrawal of Prior Financial Statements**

92.   On February 23, 2010, after the close of the market, China North shocked investors, disclosing for the first time that it would have to revise previously issued financial statements for 2008 and 2009.  The restatement was prompted by comments received from the SEC:

> [A]s a result of the preparation of responses to comments the Company received from the Securities and Exchange Commission (the "SEC") in connection with the SEC's review of the Company's Form 10-K for the year ended December 31, 2008, the Board of Directors of the Company determined that the Company's financial statements for the year ended December 31, 2008, and each interim quarter within that year, and for the quarters ended March 31, 2009, June 30, 2009 and September 30, 2009 should no longer be relied upon as a result of certain non-cash errors contained therein regarding the accounting for: (i) warrants issued in conjunction with certain financings in 2008 and 2009, which warrants should have been classified according to EITF-0019 as liability instruments rather than equity instruments; (ii) interest expense calculated using the effective interest method that should have been recorded in each of the reporting periods in question, arising from those certain financings in 2008 and 2009; (iii) changes in the fair value of the reclassified warrants; (iv) ceiling test impairment calculations prepared by the Company for the reporting periods ended December 31, 2008 and March 31, 2009; (v) depreciation, depletion and amortization expenses related to the company's oil and gas properties, net; (vi) recognition of employee stock-based compensation expense; and (vii) a modification of the February 28, 2008 secured debenture that occurred on March 5, 2009, which modification should have been treated as an extinguishment pursuant to EITF 96-19.

93.   As a result of the disclosures, the price of China North securities dropped $0.69 per share or more than 7% to close at $8.68 per share on February 24, 2010.

**Initial Estimate of Restatement**

94.    On March 8, 2010, the Company issued a press release providing further details regarding the impact of the faulty ceiling tests that had to be restated:

> The ceiling test charges (which resulted in a reduction in carrying value of oil and gas properties) were caused by several errors in the method used by the Company in the calculation.   These errors included: a) a computational error which caused incorrect discounting of future estimated cash flows, and b) incorrect tax expense assumptions incorporated in the future estimated cash flow model used by our reserve engineers.   As a result of the ceiling test impairments recognized at December 31, 2008 and March 31, 2009, the net carrying value of oil and gas properties was reduced on those dates from $70,193,852 to $67,934,989 and from $67,671,268 to $56,462,878, respectively..

95.    Moreover, the Company estimated that it would need to recognize a gain of $5.9 million for its warrants for the fiscal year ending December 31, 2008, and a loss of 9.27 million for the first three quarters of 2009.

96.    Also on March 8, 2010, over Defendant Wang's signature, the Company filed a Current Report on Form 8-K/A amending its prior February 23, 2010, Form 8-K (the "Initial 8-K"), disclosing for the first time uncertainties regarding the China North's internal controls:

> The Company has engaged an external consultant with expertise in financial accounting and reporting, including specifically the additional reporting requirements affecting oil and gas producing companies, to assist with the Company's efforts to maintain effective internal controls over financial reporting.

**Disclosure of Delisting Risk and**
**<u>Commencement of Audit Committee Investigation</u>**

97.    On April 15, 2010, the Company issued a press release announcing that it was delaying the filing of its annual report for fiscal 2009 on Form 10-K and release of its fiscal 2009 year ended financial results.   This disclosure caused the price of China North securities to fall $0.75 per share or 7.5%.

98.    The next day, on April 16, 2010, the Company disclosed that:

(a)     The Company faced delisting by the NYSE AMEX due to its failure to file timely financial reports;

(b)     Its internal investigation had uncovered certain potential internal controls deficiencies over financial reporting in connection with certain expenditures relating to business development activities and the accounting treatment of certain of the Company's accounts payables.

(c)     As a result, China North's Audit Committee would "conduct a thorough review of the situation and to determine what corrective action, if any, should be taken."

99.   As a result of these additional disclosures, China North securities fell $1.02 per share or more than 11% for the next two trading sessions closing at $8.08 per share on April 19, 2010.

**Second Estimate of Restatement**

100.  On April 20, 2010, the Company filed a Form 8-K/A with the SEC, amending the Initial 8-K for the second time and setting forth further adjustments to its financial statements for the fiscal year ended December 31, 2008, all the interim periods in 2008, and the first three quarters of 2009.  Specifically, the Company disclosed that the total adjustment to its net income for the year 2008 and the first three quarters of 2009 was estimated to be more than $36 million, wiping out the approximately $28.7 million net income previously reported for those periods. With respect to the restatement of the net carrying value of its oil properties, the Company explained that:

> that its independent reserve engineer had been utilizing an incorrectly low factor for the calculation of the Company's future projected lease operating expenses; when this was corrected the calculation resulted in a substantially reduced ceiling test value at December 31, 2008 and March 31, 2009, and a correspondingly greater ceiling test impairment figure for each of those periods.

101. As a result, "the ceiling test impairments and depreciation, depletion and amortization recognized at December 31, 2008 and March 31, 2009, [resulted in] the net carrying

value of oil and gas properties [being] reduced on those dates from $70,193,852 to $54,326,410 and from $67,671,268 to $37,500,883, respectively."  Significantly, no explanation was provided as to why only a month earlier, the Company had reduced values as of March 31, 2009 to $54.3M, but now was reducing them by another 32% given that the failure to use the proper "factor" for lease operating expenses that had been identified at the time.

102. In other words, the Company's previously reported earnings were inflated on December 31, 2008, by $15,621,000 and on March 31, 2009, by $13,825,567, due to the misreporting of the net carrying value of oil and gas properties during the Class Period.

103. The Company also announced that its recognized gain for the warrants for the fiscal year ending December 31, 2008 was $4.64 million, and its losses for the warrants for the first three quarters of 2009 were $9.805 million.

**Trading Halt and Acknowledgment of Improper Cash Transfers to Wang and Ju**

104. On May 27, 2010, the Company issued a press release announcing that NYSE AMEX had halted trading of the Company's stock on May 25, 2010.  The press release revealed further details into the Company's restatement and a number of key resignations of members of management.  Specifically, the Company disclosed that Yang Zhang resigned as the Company's Chief Financial Officer, Defendant Wang resigned as the Chairman of the Board and was on administrative leave as the Chief Executive Officer, and Defendant Ju resigned as a director of the Company.  The Company also disclosed the following in relevant part:

> On April 19, 2010, the Audit Committee retained the services of John Lees Associates Limited of Hong Kong ("JLA") to conduct a forensic audit of the Company's bank accounts with respect to the expenditures relating to business development activities in question.  The forensic audit preliminarily found that in 2009, cash transfers occurred between the bank accounts of the Company and its subsidiaries and the personal bank accounts of Mr. HongJun Wang, the Company's chief executive officer, and Ms. Guizhi Ju, a Company director and mother of Mr. HongJun Wang.  The forensic audit has confirmed that some of the

transferred funds were used to pay the Company's expenses. To date, there is no indication that any of the funds were used for personal purposes. The forensic audit is ongoing.

**Bruce Objection**

105. On July 22, 2010, Defendant Bruce, chairman of the audit committee and the Board's proclaimed "accounting expert" wrote the Board demanding that it initiate an internal investigation to determine whether there had been violation of the FCPA and other violations of GAAP not previously identified. The letter stated in pertinent part:

> I am writing to express my strong concern that the Company faces a number of new and evolving financial reporting and accounting questions that require additional investigation, as I recommend below.
>
> I have welcomed the Company's efforts to investigate and respond to accounting and internal control problems discovered during the preparation of the Company's 2009 year-end financial statements and associated 10-K filing. However, I believe that the Company must take additional steps to investigate questions raised by the John Lees Associates ("JLA") report dated July 10, 2010 (the "JLA Report" or the "Report"), including: a) whether the Company's previously filed financial reports and associated financial statements are materially correct under U.S. Generally Accepted Accounting Principles ("US GAAP"), and b) whether the Company has made payments to government officials as proscribed by the U.S. Foreign Corrupt Practices Act ("FCPA").
>
> [T]he JLA Report does not answer the two questions noted above. In fact, information contained in the JLA Report, essentially all of which was not known to me (and I presume to the other independent directors, Mr. Rule and Mr. Li) prior to completion of the Report, clearly raises important questions with respect to both the potential for material misstatements on a US GAAP basis and the ability of the Company to affirmatively attest to compliance with the FCPA (simply based on the massive internal control failures documented in the JLA Report).

106. Bruce went on to warn that a failure of the Board to "undertake what I believe are necessary investigative efforts" would lead to an end result that is likely worse for shareholders, Company management and directors.

107.    Bruce's concerns were summarily dismissed by the Board.  On August 5, 2010, Rule, the current Chairman of the Board, rejected the assertion that any further investigation was necessary or that it would be "in the best interests of [the Company's] shareholders," adding that that such an investigation "seems at odds with the prudent discharge of duties to the shareholders" which Rule stated was getting China North stock relisted.  Rules' rejection prompted Bruce to tender his resignation on August 12, 2010 while reiterating his belief that "substantial additional investigation is required in order that the Company and/or members of the board to be confident" that there were no further misstatements in the Company's financials other than those already identified in the restatement process or any violations of the FCPA.

### The Company's "Final Answer" On the Reasons for the Reserve Restatement

108.    In its Amended Form 10-K/A filed on September 10, 2010, the Company set forth the final restatement of it 2008 and 2009 reported results, as set forth in the chart at Par. 53, *supra*.  In so doing, the Company once again revised its explanation for the prior inflated valuation. Gone were references to improper "lease operating expense factors," tax rates, *etc*. This time, the entire misstatement was attributed to one factor — the decline of oil prices that had not been properly accounted for in the ceiling test computations:

> Due to the significant decline in oil prices during the fourth quarter of 2008 and the continued decline in prices for the first quarter of 2009, the net capitalized costs of our oil properties exceeded the sum of the components noted above by $15,621,000 on December 31, 2008 and by $13,825,567 on March 31, 2009, and therefore the Company has recognized impairment charges and corresponding reductions in the carrying value of those net capitalized costs of $15,621,000 and $13,825,567, as of December 31, 2008 and March 31, 2009, respectively.

109.    As noted above, this explanation (and the allocation of a substantial portion the write-down to 2009) is itself is misleading and indicative of the Defendants' reckless disregard for the truth.  First and foremost, oil prices did not decline during 1Q09.  They actually rose 10% from $44.60 per barrel to $49.66 per barrel.  Second there was no acknowledgement of a key

factor of the impairment — that the restatement reduced 4Q08 proven oil reserves from 5.4 to 4.4 bbls, all of which was restored to the 1Q09, a 25% increase.  Thus, there was no basis for allocating more than 50% of the impairment to a period ending 90 days after the end of fiscal 2008.

110.    On September 9, 2010, the Company's stock finally resumed trading after a three month hiatus.  After absorbing the shocking restatement, disclosure of improper bank account transfers, and Bruce's acrimonious departure, shareholders dumped the stock on extraordinarily high volume of 2.1 million, causing the share price to drop from $5.50 to $4.42.

111.    On July 6, 2012, NYSE filed a Form 25 delisting the common stock effective on July 16, 2012, and deregistering the common stock from Section 12(b) effective on October 4, 2012. Upon deregistration from Section 12(b), the common stock reverted to its previous registration pursuant to Section 12(g) of the Exchange Act.

112.    On April 5, 2013, the Commission entered an order pursuant to Section 12(j) of the Exchange Act revoking the registration of each class of CNEP's securities registered pursuant to Section 12 of the Exchange Act.

## ADDITIONAL ALLEGATIONS OF SCIENTER

113.    Defendants reckless disregard of the truth is apparent from several factors:

### Retention of Jimmy Cheung

114.    The scienter of the China North and the Individual Defendants is best evidenced by their retention of Jimmy C.H. Cheung & Co. ("Jimmy Cheung") as China North's independent auditor.  Jimmy Cheung was collaborator in the fraud.  The firm has a long history of serving U.S. listed companies for relatively short durations and either being dismissed or resigning amid rumors of fraudulent conduct.

115.    The chart below demonstrates Jimmy Cheung's departure from twelve companies listed in the United States — over half of its U.S. traded clientele.   Facing this barrage of dismissals, the firm finally merged with Baker Tilly Hong Kong Limited in January, 2010, shortly after the PCAOB issued a report critical of the firm.   At the time of the merger, Jimmy Cheung had only eight U.S. listed clients remaining.   One of those eight company's is China North, for whom Jimmy Cheung and Baker Tilly performed work on the Company's restated financials, indicative of the integrity of the Company's restatement.



**Manipulation of Warrant Accounting**

116.    China North recognized that the warrants it issued to Lotusbox were debt securities.   Indeed, throughout the Class Period, the Company made the representation that it "accounts for [the Lotusbox warrants] as liability instruments in accordance with paragraph 8 of EITF 00-19."

117.    As it turned out, this was an outright fabrication.   In the Company's April 20 8-K, it acknowledged that the Lotusbox warrants were, in fact, accounted for by the Company as equity instruments, rather than liabilities.   The fact that the Company represented that it was

properly accounting for the warrants as debt, but was not doing so internally, is reflective of defendant's reckless indifference to the truth.

**Other Factors Indicating Defendants' Scienter:**

118.    The Company's internal controls were so flawed that it allowed its CEO Wang and his mother Ju to engage in "a very large number and amount of unauthorized transfers of Company funds" as detailed above, which eviscerated the proceeds from two separate offerings.

119.    The sheer size of the restatement bespeaks of Defendants' scienter.    The Company's total downward adjustment of $36.16 million for fiscal year 2008 and the first three quarters of 2009 completely eviscerated the its reported profits for those periods.

## THE SEC AND DOJ ACTIONS

120.    On November 29, 2012, the Securities and Exchange Commission ("SEC") filed an action against Defendants China North, Wang, Ju, and Chao Jiang (another corporate insider), captioned *SEC v. China Northeast Petroleum Holdings Ltd., et al.*, 12 Civ. 8696 (S.D.N.Y.) (Buchwald, J.) (the "SEC Action"), alleging, *inter alia*, that Defendants looted approximately $59 million from the Company's bank accounts by engaging in numerous undisclosed and fraudulent related party transactions, including 176 fraudulent transfers committed by Wang and Ju in 2009 alone.  The SEC allegations were based in part on the JLA report.

121.    The SEC Action further alleges that Defendants Wang and Ju, along with Chao Jiang, diverted approximately $59 million in 2009 alone from the Company's bank accounts to their own personal and familial coffers.  Worse yet, the entire $29.9 million in net proceeds raised from two offerings issued by the Company in September and December 2009 were stolen by Wang and Ju.

122.    As detailed above, and as alleged in the SEC Action, on September 16, 2009 China North filed a Current Report on Form 8-K (the "September 8-K") signed by Wang, in which the Company announced a public offering of its stock. The September 8-K included a copy of a press release that China North issued to the public the same day, which stated that the Company would "use the net proceeds from the offering to fund its future business expansion plan, and for general working capital purposes." The September 8-K also included a copy of a Securities Purchase Agreement in which China North represented that it "shall use the net proceeds from the sale of the Securities hereunder for working capital purposes and shall not use such proceeds for: (a) the satisfaction of any portion of the Company's debt (other than payment of trade payables in the ordinary course of the Company's business and prior practices) . . . ."

123.    Then, on December 15, 2009, China North filed another Current Report on Form 8-K signed by Wang (the "December 8-K") announcing a second offering of its stock. The December 8-K included a copy of a press release that the Company issued the same day, in which it represented that it planned to "use the net proceeds from the offering to redeem its 8% Senior Debenture issued to Lotusbox Investments Ltd. on February 28, 2008 and for general working capital purposes." The December 8-K also included a copy of a Securities Purchase Agreement in which China North represented that it "shall use the net proceeds from the sale of the Securities hereunder for working capital purposes and repayment of debt and shall not use such proceeds for: (a) the redemption of any Common Stock or Common Stock Equivalents, (b) the settlement of any outstanding litigation or (c) and [sic] shall not use such proceeds in violation of the FCPA or OFAC regulations."

124.    China North raised $18.4 million in September 2009 and $13.5 million in December 2009 through two best-efforts offerings underwritten by a New York-based

investment bank. All of the offering proceeds were deposited into China North's U.S. Bank Account.

125.    Defendant Wang had signature authority over the account from the time it was opened in 2005 through at least February 7, 2011, at which time he re-signed the signature card and added his wife, Jishuang Sun ("Sun"), as an additional signatory. During that period, Defendant Ju regularly directed Jiang Chao (who also had signatory authority) to make transfers to and from the account despite having no official authority over the bank account.  For example, Defendant Ju directed Jiang Chao to transfer $300,000 of proceeds from China North's U.S. Bank Account to a personal bank account held in the name of her daughter-in-law, Sun. Thereafter, on November 19, 2009, Jiang Chao effected the transfer from the U.S. Bank Account to Sun. Sun then used those funds to purchase a home in California in her name. There is no known or documented business purpose for the transfer, and the Board of Directors was not apprised of, and did not authorize, the transfer.

126.    Between September 25 and 29, 2009, Defendant Ju also received multiple transfers of proceeds totaling approximately $5.85 million. Jiang Chao authorized and caused the transfers to be made from the U.S. Bank Account into which the offering proceeds were deposited. The transfers were subsequently routed through multiple China North bank accounts in China before being deposited into Defendant Ju's personal bank account in China. There is no known or documented business purpose for these transfers, and China North's board was not apprised of, and did not authorize, them.

127.    Prior to the deposit of offering proceeds into China North's U.S. Bank Account, there were insufficient funds in the account to fund the aforementioned transfers. Indeed, immediately prior to the first deposit of offering proceeds on or about September 16, 2009,

China North's U.S. Bank Account had a balance of only approximately $84,000. None of the aforementioned transfers were disclosed to the investing public.

128.   Based on these facts, and others alleged above, the district court denied Defendants China North and Wang's motions to dismiss the SEC Action, finding that the complaint adequately pled material misrepresentations and scienter.  As a "threshold matter," the Court recognized that undisclosed related-party transactions, while not per se unlawful, must be viewed with "extreme skepticism." *S.E.C. v. China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 389 (S.D.N.Y. 2014).  "But even absent this presumption, based purely on the facts alleged in the Complaint, [Defendant] Wang had a clear, twofold motive for filing substantially misleading documents with the SEC: (1) to funnel offering proceeds into his own account and that of his relatives, and (2) to conceal this conduct from the investing public and the government."  On these facts, the Court found the inference of scienter to be "inescapable." *Id.*

129.   Additionally, following the filing of the SEC Action, finding probable cause, Defendant Wang and Chao Jiang were indicted on May 28, 2013 by a grand jury in the District of Columbia for conspiracy to commit securities fraud and wire fraud, securities fraud, making false statements to the SEC, aiding and abetting securities fraud violations, and for criminal forfeiture.  *See U.S. v. Hongjun Wang, et al.*, 13-cr-00152-RJL, D. Columbia, Docket Entry 26. Chao Jiang plead guilty to one count of knowing failure to devise and maintain a system of internal accounting controls at China North in violation of 15 U.S.C. §§ 78m(b)(2)(B), 78m(b)(5), and 78ff.  *Id.* at Docket Entry 123.  Defendant Wang is a fugitive.  *Id.* at Docket Entry 116.

## **CLASS ACTION ALLEGATIONS**

130.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired China North common stock, including purchasers of common stock, during the Class Period (the "Class"); and were damaged thereby.   Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

131.    The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, China North securities were actively traded on the NYSE AMEX.   While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by China North or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

132.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

133.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

134.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, financial condition, operations, internal controls, prospects and management of China North;

- whether the Individual Defendants caused China North to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of China North securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and;

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

135.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

136.    Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- China North securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE AMEX, and was covered by analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased China North securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

137. Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## CLAIMS FOR RELIEF

### COUNT I

**(Against All Defendants For Violations of
Section 10(b) And Rule 10b-5 Promulgated Thereunder)**

138. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

139. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

140. During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of

China North common stock; and (iii) cause Plaintiff and other members of the Class to purchase China North common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

141.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for China North common stock.   Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about China North's results and oil reserves.

142.   China North and the Individual Defendants acted with reckless disregard for the truth for reasons stated in paragraphs 107-113; 118-120, *supra*.

143.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of China North securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning China North's business, financial condition, operations, internal controls and prospects which were concealed by defendants, Plaintiff and the other members of the Class purchased China North common stock at artificially inflated prices and relied upon the price of the common stock, and the integrity of the market, and were damaged thereby.

144.   During the Class Period, China North common stock traded on an active and efficient market.

145.   By reason of the conduct alleged herein, defendants knowingly or recklessly, directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

146.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

147.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

148.     (a)     During the Class Period, the Individual Defendants participated in the operation and management of China North, and conducted and participated, directly and indirectly, in the conduct of China North's business affairs. Because of their senior positions, they knew the adverse non-public information about China North's misstatement of income and expenses and false financial statements.

(b)     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to China North's financial condition and results of operations, and to promptly correct any public statements issued by China North which had become materially false or misleading.

(c)     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which China North disseminated in the marketplace during the Class Period concerning China North's results of operations. Throughout the Class Period, the Individual Defendants exercised

their power and authority to cause China North to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of China North within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of China North securities and options.

149. Each of the Individual Defendants, therefore, acted as a controlling person of China North. By reason of their senior management positions and/or being directors of China North, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause China North to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of China North and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

150. Specifically, Defendant Ju was one of the founders of China North. Since the Company's inception, she was actively involved in the day-to-day decisions, operations, and management of China North, even during periods when it was not disclosed that she was acting as an officer or director of the company.

151. Except when she was briefly appointed to serve as a director from November 20, 2009 through May 23, 2010, Defendant Ju did not have any disclosed role at China North. Nonetheless, she engaged in numerous transactions with and on behalf of the Company, including those described above.

152. Before, during and after her brief tenure as a China North director, Defendant Ju exerted actual control over China North. For example, Defendant Ju made decisions and entered into agreements on behalf of Company, including directing transfers of assets from China North

to herself and others, and allegedly entering into transactions with vendors on behalf of China North. Defendant Ju also attended and participated in meetings of the Board of Directors before and after she served as a director.

153.    On May 23, 2010, after the Board of Directors received a preliminary report from JLA, the Board of Directors issued a resolution that, among other things, (i) placed Defendant Wang on administrative leave as CEO and accepted Defendant Wang's resignation as Chairman of the Board (although he was allowed to continue serving as a director), and (ii) accepted Defendant Ju's resignation as a director. The board resolution further stated that "going forward, Ms. Ju shall have no role in the operation of the Company or its subsidiaries and she shall have no authority to act on behalf of the Company or its subsidiaries." On May 27, 2010, China North filed a Form 8-K disclosing that Defendant Ju had resigned as a director and that Defendant Wang had resigned as Chairman of the Board of Directors and was placed on administrative leave as President and CEO.

154.    Defendants Wang and Ju nevertheless continued to exert control over China North and certain of its subsidiaries after May 23, 2010.

155.    Defendant Ju continued to be actively involved in the day-to-day operations and management of China North subsequent to May 23, 2010, when she was officially barred by the Board of Directors from participating in the company's operations. For example, Defendant Ju continued to attend board meetings and negotiate with outside counsel regarding payment for services rendered to China North. Defendant Ju also continued to serve as the General Manager of two of China North's operating subsidiaries in China, Song Yuan City Yu Qiao Oil and Gas Development Ltd. Corp and Longde Oil and Gas Development Co. Ltd.

156.    Defendant Wang was the largest shareholder of China North, continued to serve as the General Manager for the China North subsidiary, Song Yuan North East Petroleum Technical Service Co. Ltd., and continued to have signature authority over CNEP's Bank of America account even after May 23, 2010.

157.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by China North.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands Judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem Just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by Jury of all issues that may be so tried.

Dated:  December 15, 2015

**POMERANTZ LLP**

By: _____
Jeremy A. Lieberman
Marc I. Gross
Tamar A. Weinrib
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile:  (212) 661-8665

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Phone: 312-377-1181
Fax: 312-377-1184

*Lead Counsel for the Class*

**WEISS & LURIE**
Joseph H. Weiss
James E. Tullman
Mark D. Smilow
551 Fifth Avenue, Suite 1600
New York, New York 10176
Telephone: (212) 682-3025
Facsimile:  (212) 682-3010

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
Phillip Kim
Timothy W. Brown
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827

*Counsel for Plaintiff*